UNITED STATES of America

v.

**Martin SWEIG and Nathan Voloshen, Defendants.**

**No. 70 Cr. 20.**

United States District Court, S. D. New York.

April 22, 1970.

On Motion to Dismiss for Want of Venue May 8, 1970.

On Motion to Dismiss Perjury Count June 1, 1970.

On Motion for Physical Examination June 15, 1970.

Whitney North Seymour, Jr., U. S. Atty., S.D. New York, for the United States; William J. Gilbreth, Richard Ben-Veniste, Asst. U. S. Attys., of counsel.

Paul T. Smith, Boston, Mass., for defendant, Martin Sweig; Gilbert Rosenthal, New York City, of counsel.

Kostelanetz & Ritholz, New York City, for defendant, Nathan Voloshen; Jules Ritholz, New York City, of counsel.

## OPINION

FRANKEL, District Judge.

The court has been presented with an array of motions by defendants Martin Sweig and Nathan Voloshen, who are variously charged, separately or together, in a 15-count indictment. The court has heretofore decided motions for particulars and discovery. Additional rulings are now ready and are announced herein. Others remain for study and decision in the near future.

The first count of the indictment charges both defendants with a conspiracy violative of 18 U.S.C. § 371. It alleges that from the beginning of 1964 to the date of the indictment in January 1970, defendant Sweig, who was serving in Washington, D. C., as an Assistant to Speaker John W. McCormack of the

United States House of Representatives, and defendant Voloshen, who lived and had an office in New York City conspired

"with each other and with other persons to the grand jury known and unknown,[1] to defraud the United States and agencies thereof, in connection with its lawful governmental functions hereinafter described, to wit: (a) its lawful function to have its business and affairs conducted honestly and impartially as the same should be conducted, free from fraud, improper and undue influence, dishonesty, unlawful impairment and obstruction; (b) its lawful right to have its officers and employees, free to transact the official business of the United States unhindered, unhampered, unobstructed, unimpaired and undefeated by the exertion upon them of dishonest, unlawful, impaired and undue pressure and influence."

Paragraph 4 of the indictment says it was part of the conspiracy (a) that Voloshen "would and did accept fees from various persons with matters pending before [federal] departments and agencies * * * to exert the influence of the office of the Speaker of the House to said agencies, on behalf of said persons," (b) that Voloshen "would and did use the offices, telephone, secretarial staff, and goodwill of the Speaker," (c) that both defendants would agree to have Sweig, "by various means, express the interest of the Office of the Speaker * * * in said matters * * * on behalf of said persons," (d) that Voloshen "would and did falsely assume and pretend" to be a member of the Speaker's staff and (e) that Sweig "would and did act as agent and attorney for persons before departments and agencies of the Government in connection with * * * matters in which the United States was a party and in which it had a direct and substantial interest." Paragraph 5 alleges the use of telephone calls, from the Speaker's offices and elsewhere, and of personal visits by both defendants to "express the interest of the office of the Speaker of the House in said matters pending before said agencies." A list of 15 alleged overt acts includes a number of telephone calls, two appearances before the Securities and Exchange Commission, and receipts of fees on two occasions by defendant Voloshen.

Count Two charges that Voloshen, on November 1, 1968, violated 18 U.S.C. § 912 by falsely pretending to be a member of the Speaker's staff and appearing in that guise before the Treasury Department's Alcohol, Tobacco and Firearms Division, where he "advocated a position on behalf of the Century Arms Company."

Count Three charges that Sweig, aided and abetted by Voloshen, violated 18 U.S.C. § 205 when, on May 7, 1969, he appeared before the S.E.C. "as an agent for the Parvin/Dohrmann Company" in connection with the Commission's suspension of trading in that Company's stock.

Counts Four through Twelve charge Sweig with perjury in testimony he gave before a grand jury in this Court on October 15, 1969. Briefly described, these charges allege false testimony concerning: a visit to S.E.C. headquarters, the arranging of an appointment there for Voloshen, the subjects or existence of telephone calls to specified government people, and Sweig's acquaintance with, or knowledge of, named individuals for whom, in the Government's evident theory, the defendants are thought to have conspired to exert improper influence or otherwise to act unlawfully.

Counts Thirteen through Fifteen charge perjurious grand jury testimony by Voloshen on August 15 and 19, 1969, concerning payments to him, and, on the latter date, concerning his knowledge of one individual and representation of another.

---

1. The bill of particulars ordered by the court names those "known" as John F. Donato and Eugene Kinally (now deceased).

*Motions To Dismiss*

1. Both defendants seek dismissal of the indictment on the ground that it was preceded by masses of publicity reporting or speculating about allegations of misconduct by them, and that this deprived them of the right to have an impartial and unbiased grand jury determine whether or not they should be indicted. See Costello v. United States, 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397 (1956); Lawn v. United States, 355 U.S. 339, 349, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958). There appears to be no doubt about the existence, character and large quantity of pre-indictment publicity. But defendants do not shoulder the probably unmanageable burden of arguing that those factors alone could warrant nullification of the grand jury's decision to indict. Cf. Costello v. United States, *supra,* 350 U.S. at 362–363, 76 S.Ct. 406; Lawn v. United States, *supra,* 355 U.S. at 349–350, 78 S.Ct. 311; Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 399–400, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959); United States v. Blue, 384 U.S. 251, 255, 86 S.Ct. 1416, 16 L.Ed.2d 510 n. 3 (1966); United States v. Nunan, 236 F.2d 576, 593 (2d Cir. 1956), cert. denied, 353 U.S. 912, 77 S.Ct. 661, 1 L.Ed.2d 665 (1957). Instead, the focus of their attack is upon the asserted fact that much of the publicity was generated by the Department of Justice itself or by other agencies of the Government. And while even this seeks an unprecedented kind of relief, see Gorin v. United States, 313 F.2d 641, 645 (1st Cir. 1963), the argument on its face has substance.

■ Granted the historic proposition that grand juries may roam fairly widely (and certainly outside the limits of Wigmore's concerns) in collecting their factual beliefs, e. g., Costello v. United States, *supra,* it can hardly be doubted now that prosecutors must observe some limits of essential fairness in their work with such investigatory bodies. See United States v. Umans, 368 F.2d 725, 730 (2d Cir. 1966). Unless the role of the grand jury as a shield for the citizen as well as a prosecutorial agency is to become an empty slogan, there are kinds of pressure that must obviously be avoided to the extent possible. However free may be the sources of "fact," the generation of public animus against a prospective defendant, with the attendant danger that grand jurors may be subjected to subtle or explicit "demands" for prosecution, see Sheppard v. Maxwell, 384 U.S. 333, 339–342, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); see also Beck v. Washington, 369 U.S. 541, 585–587, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962) (Douglas, J., dissenting), is no part of the prosecution's legitimate business. It may be (at least the court accepts for now, as defendants appear to do) that such "atmospheric" influences have to be dealt with by measures short of dismissing indictments when the sources and causes are wholly non-official. But the interest in the integrity of the criminal process may require sterner measures of prophylaxis if the prosecution itself forgets its duty to "be sensitive to the considerations making for wise exercise of such investigatory power." Hoffman v. United States, 341 U.S. 479, 485, 71 S.Ct. 814, 817, 95 L.Ed. 1118 (1951).

This thought may proceed a small step beyond the lower-court precedents the Government cites. It has indeed been common in past cases to reject motions of the general kind here in question for failure to show actual "prejudice" resulting from pre-indictment publicity. United States v. Osborn, 350 F.2d 497 (6th Cir. 1965), aff'd, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966); Estes v. United States, 335 F.2d 609, 613 (5th Cir. 1964), cert. denied, 379 U.S. 964, 85 S.Ct. 656, 13 L.Ed.2d 559 (1965); Gorin v. United States, 313 F.2d 641, 645 (1st Cir. 1963), cert. denied, 379 U.S. 971, 85 S.Ct. 669, 13 L.Ed. 2d 563 (1965); Beck v. United States, 298 F.2d 622, 627 (9th Cir.), cert. denied, 370 U.S. 919, 82 S.Ct. 1558, 8 L.Ed. 2d 499 (1962); United States v. Dioguardi, 20 F.R.D. 33, 34–35 (S.D.N.Y. 1956). But such rulings, perhaps reflecting the nearly impenetrable armor

traditionally protecting indictments, have tended to prescribe a test normally impossible of fulfillment. The secrecy of the grand jury's work, usually preserved in large measure at least until or after the trial, is a barrier to even an attempted showing of prejudice. It has sometimes seemed, therefore, that attacks upon indictments because of prejudicial publicity were inevitably doomed as a matter of law.

There have, nevertheless, been intimations before now that the case of prosecution-inspired publicity might be different. See Silverthorne v. United States, 400 F.2d 627, 633–634 (9th Cir. 1968); United States v. Nunan, 236 F.2d 576, 593 (2d Cir. 1956), cert. denied, 353 U.S. 912, 77 S.Ct. 661, 1 L.Ed.2d 665 (1957); United States v. Kahaner, 204 F.Supp. 921, 922 (S.D.N.Y.1962). Recent developments give special meaning to such warnings. We have been led (or driven) only in very recent days to intervene some in the reconciling of the interests in free expression and fair criminal proceedings. In our first steps at least, there has been wide recognition, as a matter of propriety not less than power, that greater demands should be made upon the court's own officers than upon those whose business it is to gather and purvey the "news." See ABA Project on Minimum Standards for Criminal Justice, Fair Trial and Free Press 76–79 (Tent.Draft 1966—"the Reardon Report"). In the implementation of that understanding, we have recognized the dangers of publicity before as well as after indictment.

Thus, this Court's Criminal Rule 8, effective January 1, 1969, says in part:

"With respect to a grand jury or other pending investigation of any criminal matter, a lawyer participating in the investigation shall refrain from making any extrajudicial statement, for dissemination by any means of public communication, that goes beyond the public record or that is not necessary to inform the public that the investigation is underway, to describe the general scope of the investigation, to obtain assistance in the apprehension of a suspect, to warn the public of any dangers, or otherwise to aid in the investigation."

In light of the foregoing considerations, including the quoted local Rule, the court found insufficient the Government's initial responses in this case to the charges of pre-indictment publicity. The large collection of newspaper stories submitted by defendants contained indications (references to "official" informants and the like) that their sources were government people. Cf. United States v. Kahaner, 204 F.Supp. 921, 922 (S.D.N.Y.1962). The Government's answering papers contained no factual affidavit, resting upon the proposition that the motions must be rejected as a matter of law. Then, however, when the court suggested the possible insufficiency of that broad proposition, affidavits were filed denying explicitly that the then United States Attorney, his Assistants working on the case or any of their colleagues had given out the statements and alleged information recounted in the press. It is conceded that the Assistant Attorney General in charge of the Criminal Division, Department of Justice, about a month before the indictment, did make "a general statement in response to a press inquiry * * * to the effect that grand juries in Baltimore and New York were investigating the activities of Nathan Voloshen * * *." Affidavit of Assistant United States Attorney Richard Ben-Veniste, sworn April 9, 1970, par. 8. It is not clear whether the Government believes this statement to have been in entire conformity with our Rule 8, although we are assured on behalf of the Assistant Attorney General that "he did not at any time reveal to members of the press or other media, formally or informally, anything that occurred in the grand jury or anything to do with the substance of [the] case." *Id.* Whatever the details may be, and assuming that the December 1969 activity may have been inconsistent with our recently pro-

mulgated Rule, the incident does not appear to be of major proportions.

■ Taking all the materials together, defendants have failed to present a concrete basis for inferring that government officials were responsible in any substantial degree for the unquestionably considerable amount of publicity preceding the indictment. Cf. United States v. Kahaner, *supra*, 204 F.Supp. at 922–923. The unspecified "sources" mentioned in the newspaper stories defendants cite are nowhere particularized. Granting that the particularization is no simple matter, especially in view of the care journalists exercise to preserve the confidentiality of their sources, cf. Application of Earl Caldwell, 311 F.Supp. 358 (N.D.Cal., April 6, 1970), the circumstances do not now justify an evidentiary hearing to test on this asserted ground the validity of the indictment.

Should there be a conviction, this subject may be added to matters (namely, the alleged "taint" resulting from unlawful eavesdropping) already anticipated as questions for post-trial consideration. It may be appropriate then, if only to supply a fuller record for appellate review, to have a more precise and direct account of what the Assistant Attorney General said to the press in December 1969. It may also be appropriate to consider whether defendants should then be permitted to study the grand jury minutes to appraise the kind and amount of evidence that body had before it and thus, possibly, to mount a claim of prejudice from the relative impact of outside influences.

Without foreclosing such renewed efforts if they should come to seem necessary and proper, the court at this time rejects the prayers for dismissal because of publicity preceding the indictment.

2. Defendant Sweig urges that Count One fails to state an offense. It may be, he suggests, that the conduct alleged would offend a refined sense of ethical propriety. But Congress, the argument proceeds, has been notably more lenient about ethical restraints with itself and its staffs than with people in other branches, and has not proscribed activities like those alleged in Count One. If this construction of 18 U.S.C. § 371 is correct, whatever the motives of its framers, then the motion must of course be granted. But the court concludes that defendant Sweig has misconceived the statute and misread the Count in question.

■■ The statute, it was settled long ago, when it outlaws schemes "to defraud the United States," covers all manner of conspiracies "to interfere with or obstruct one of [the Federal Government's] lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest." Hammerschmidt v. United States, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924); Haas v. Henkel, 216 U.S. 462, 476, 30 S.Ct. 249, 54 L.Ed. 569 et seq. (1910); United States v. Manton, 107 F.2d 834 (2d Cir. 1939). The sweep of that prohibition embraces the conspiracy charged in Count One.

It is charged, *inter alia,* that Sweig and Voloshen agreed to have the latter take fees from people with matters before government agencies in exchange for undertaking "to exert the influence of the office of the Speaker of the House to said agencies * * *." This alone would seem sufficient to allege a conspiracy forbidden by § 371. There is no allegation, Sweig says, that the agreement was "to exert the influence of the office of the Speaker" either "untruthfully" or "contrary to what [Sweig] reasonably thought were the Speaker's general instructions * * *." Whether this rather subtle point has any reality may be a matter to be fully understood only on the basis of detailed evidence at a trial. It remains, that is, to know what can be signified by the notion in this context of "untruthfulness" or of disobedience to instructions. Surely, even apart from the presumption of official regularity, there is not a word in the indictment charging any semblance of improper conduct by the Speaker himself. Still more surely, we are compelled

to presume at this point that the Speaker neither knew of nor intimated any disposition to sanction the scheme alleged. And so the argument seems to dwindle to the suggestion that as the indictment is framed, it leaves entirely open the possibility that the alleged positions pressed (or agreed to be pressed) by the conspirators (in return for payments to Voloshen) as those of "the office of the Speaker" were not contrary to those the office might have taken apart from the conspiracy.

██ Whether that is 'actually the limited import of the Government's contentions under Count One must, as has been stated, await further development of the case. But this makes no difference for purposes of the motion now under consideration. For it is by now perfectly clear "that the payment of money by a private person to an official of the Government for the performance of an official act constitutes a fraud." United States v. Johnson, 337 F.2d 180, 186 (4th Cir. 1964), affirmed on another issue, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed. 2d 681 (1966);[2] cf. 18 U.S.C. § 201(f). It is at least equally clear that the taking of such payments by one purporting to act for an official, plus the promise to exert improper pressures upon other officials, comes within the ban against schemes "to interfere with or obstruct * * * lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest." Hammerschmidt v. United States, *supra*, 265 U.S. at 188, 44 S.Ct. at 512.

██ The fact that Sweig is not alleged to have taken money or other things for his part in the alleged conspiracy does not justify dismissal of Count One for facial insufficiency. It may be doubted whether a jury would —or could be permitted to—convict unless it found evidence to show for each

alleged conspirator some meaningful "stake" in the enterprise. But the interest need not have been monetary, or material at all. See Craig v. United States, 81 F.2d 816, 822 (9th Cir.), cert. denied, 298 U.S. 690, 56 S.Ct. 959, 80 L.Ed. 1408 (1936). At any rate, the failure to allege this motivational point is not fatal to the indictment.

In addition to the things already mentioned, Count One charges that, as part of the combination and conspiracy, Voloshen used the Speaker's offices, staff, and other facilities, posed falsely as a member of the Speaker's staff, and himself called various executive officers for the purpose of "expressing the interest" of the Speaker's office.

██ Taken all together, the allegations of Count One seem more than ample to state an offense. There may be interesting questions later on as to how many of these allegations must be proved to establish the charge. But that is a problem far down the road from here.

3. Defendant Sweig has also moved to dismiss Count Three for failure to state an offense. While he is charged literally with a violation of 18 U.S.C. § 205—namely, with acting "as agent or attorney" for the Parvin/Dohrmann Company before the S.E.C. in connection with a proceeding by that agency affecting suspension of trading in the company's stock—he says no violation should be deemed effectively to be alleged because

(1) he is not an attorney and never claimed to be one, and

(2) he was not an "agent" in the sense of having "power to affect the legal relations" of his alleged principal.

██ The Government responds quite properly that these contentions are not fairly addressed to the face of the in-

---

**2.** While the Supreme Court was concerned with a different question, it did touch the point here involved in these words (p. 172, 86 S.Ct. at p. 751): "No argument is made, nor do we think that it could be successfully contended, that the Speech or Debate Clause reaches conduct, such as was involved in the attempt to influence the Department of Justice, that is in no wise related to the due functioning of the legislative process."

dictment, but to the state of facts Sweig predicts the proofs will show. Beyond that, however, his construction of § 205 does not seem sound. Given the abstract character of the issue at this time, the court deems it best to go no further now than to say that the strict common-law notion of "agency" does not necessarily exhaust the meaning of the prohibition. On the contrary, the language of the statute and the background materials the parties have cited point to a different and wider meaning. How far that meaning must be defined for the instant case is a matter for later consideration upon more particularized facts.

4. Next defendant Sweig moves to dismiss Counts Four through Twelve of the indictment, charging him with perjury before the grand jury, on the ground that he was "tricked" into appearing before the grand jury without suitable warnings of his rights.

 Among the basic premises of this motion is the argument that it is improper to bring a "prospective defendant" before the grand jury. The argument is incorrect. United States v. Wolfson, 405 F.2d 779, 784–785 (2d Cir. 1968), cert. denied, 394 U.S. 946, 89 S.Ct. 1275, 22 L.Ed.2d 479 (1969); United States v. Capaldo, 402 F.2d 821, 823–824 (2d Cir. 1968), cert. denied, 394 U.S. 989, 89 S.Ct. 1476, 22 L.Ed.2d 764 (1969); United States v. Fortunato, 402 F.2d 79, 82 (2d Cir. 1968), cert denied, 394 U.S. 933, 89 S.Ct. 1205, 22 L.Ed.2d 463 (1969); United States v. Winter, 348 F.2d 204, 207 (2d Cir.), cert. denied,

382 U.S. 955, 86 S.Ct. 429, 15 L.Ed.2d 360 (1965).

 The papers show that Sweig was given full and complete warnings at the outset of his first appearance before the grand jury. His assertion that the prosecutors knew he would testify contrary to other testimony—or, pursuing the implications, that they knew he would make sworn statements warranting indictment for knowing and willful acts of perjury—is an ineffectual mixture of speculation and bad law. Cf. United States v. Corallo, 413 F.2d 1306, 1328 (2d Cir. 1969). Equally unavailing is the contention that Sweig, who appears to be a high and experienced aide to the House Speaker, was deprived of a fundamental right because he was not told he could consult with a lawyer before his grand jury appearance. Assuming that there was such a right, the omission gave no license to lie to the grand jury. United States v. Winter, *supra,* 348 F.2d at 208; see also United States v. Knox, 396 U.S. 77, 78–80, 90 S.Ct. 363, 24 L. Ed.2d 275 (1969); Bryson v. United States, 396 U.S. 64, 70–72, 90 S.Ct. 355, 24 L.Ed.2d 264 (1969).[3]

### Motions for Severance

 1. The defendants move on several grounds for partial or total severance. First in order of logic and relative interest is defendant Voloshen's claim [4] that the inclusion in a single indictment of separate perjury counts against Sweig and himself exceeds the limits of permissible joinder under Fed. R.Crim.P. 8(b).[5]

---

3. Sweig's motion to suppress his grand jury testimony, grounded in the same legal theories, fails for the reasons already stated. He also moves to suppress statements to one or more Assistant United States Attorneys, invoking for this Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The rules of those decisions, governing custodial interrogation, have no application here. United States v. Scully, 415 F.2d 680, 683–684 (2d Cir. 1969); see United States

v. Mackiewicz, 401 F.2d 219, 221–223 (2d Cir.), cert. denied, 393 U.S. 923, 89 S.Ct. 253, 21 L.Ed.2d 258 (1968).

4. It is not clear whether defendant Sweig makes the same contention for himself. The court's denial of Voloshen's motion applies equally in any event.

5. "Joinder of Defendants. Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or

This contention, characterized by counsel for Voloshen as "exquisite" in its tailoring, does not touch the first three counts. Rather, starting from Judge Weinfeld's careful opinion in United States v. Charnay, 211 F.Supp. 904 (S.D.N.Y.1962)—including the observation therein (p. 906) that "perjury is as highly a personalized crime as exists upon the statute books"—Voloshen argues that there is no authority for the joinder of "distinct and independent offenses of perjury, not provable by the same evidence and not connected together by a charge of conspiracy to commit said perjuries." Without stopping over the one or two questionable premises in that formulation, the court concludes that, at least as of now, joinder of the perjury counts is not improper.

The Government demonstrates a direct connection between each of the perjury charges and one or more overt acts connected with the conspiracy count. On this basis alone, most of the evidence on the perjury counts would be admissible in the trial even if those counts were omitted altogether. Thus, as is not uncommon, the conspiracy charge supplies both a technical nexus requisite for the joinder and a practical forecast that there will not be an undue and prejudicial accumulation of evidence requiring difficult or impossible compartmentalization by the jury. Cf. United States v. Granello, 365 F.2d 990, 993–995 (2d Cir. 1966), cert. denied, 368 U.S. 1019, 87 S.Ct. 1367, 18 L.Ed.2d 458 (1967); In re Gottesman, 332 F.2d 975 (2d Cir. 1964), a denial of mandamus where the majority approved on the merits Judge Bonsal's decision in United States v. Cohn, 230 F.Supp. 587 (S.D.N.Y.1964); United

States v. Haim, 218 F.Supp. 922, 930–931 (S.D.N.Y.1963); United States v. Verra, 203 F.Supp. 87, 90–91 (S.D.N.Y. 1962). The cited cases show that the count supplying this sort of justification need not be one charging a conspiracy to commit perjury, as Voloshen suggests. It is enough that the proof promised by the Government will sufficiently evidence "joint action * * * [to permit] the Government to introduce at separate trials the same proof * * * offered at the joint one * * *." United States v. Granello, *supra*, 365 F.2d at 995.

As further support for its position, the Government argues that the allegedly perjurious statements would be admissible on the trial of the conspiracy count as assertedly false exculpatory statements. The argument appears to be solidly grounded. United States v. Corallo, 413 F.2d 1306, 1327–1328 (2d Cir. 1969); United States v. Verra, *supra*, 203 F.Supp. at 91.[6] Assuming for now that each defendant's statements in this category will be admissible only against him, that would be no less true in the unquestionably permissible joint trial on the conspiracy count.

It appears now, in short, that substantially all the evidence on the perjury counts—granting the undoubtedly vital and "highly * * * personalized" elements of individual knowledge and intent—could properly be heard in a joint trial even if these counts were absent. In this light, both the claim for relief "as of right" under Rule 8(b), Metheany v. United States, 365 F.2d 90, 94–95 (9th Cir. 1966); Ingram v. United States, 272 F.2d 567, 569–570 (4th Cir. 1959); United States v. Ricciardi, 40 F.R.D. 133

---

offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count."

6. Judge Weinfeld in *Verra* (*id.* n. 17) referred in this connection to Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957). The overruling of *Delli Paoli* in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), does not seriously affect the

point of present consequence. As is noted just below, it is not here significant if, as is probable, the allegedly false exculpatory statements may be considered only against the respective defendants uttering them. The problem is one for seemingly manageable instructions to the jury. United States v. Tropiano, 418 F.2d 1069, 1080–1081 (2d Cir. 1969), cert. denied, 397 U.S. 1021, 90 S.Ct. 1262, 25 L.Ed.2d 530 (1970); United States v. Corallo, *supra* at 1327–1328.

(S.D.N.Y.1965), and the appeal to discretion under Rule 14 are insufficient. It remains possible, of course, that different things or a different light may appear as the case advances toward or through the trial stage. Accordingly, the denial now of the application for a severance is without prejudice to a renewed application in changed circumstances later on.

■ 2. Both defendants move for severance on the asserted ground that each would like to call the other to the stand but will be unable to do so if they are tried together. Sweig says in this connection that he will take the stand in his own defense. Voloshen, as is his right, does not say whether he will or not. Each indicates in the most general terms that his innocence can be demonstrated by the testimony of the other, even, possibly, at that other's expense. But such generalities could be tendered as grounds for severance in any case whatever. They do not approach the concrete showing of need and probable utility of the codefendant's testimony which has been held on occasion to justify relief of the kind sought. See United States v. Caci, 401 F.2d 664, 671–672 (2d Cir. 1968); cf. United States v. Gleason, 259 F.Supp. 282, 283–285 (S.D. N.Y.1966).

The court finds insufficient all the grounds thus far urged for a severance. The motions for such relief will be denied.

## ON MOTION TO DISMISS FOR WANT OF VENUE

■ Following study of successive bills of particulars, the court now reaches the motion of defendant Sweig to dismiss for want of venue Counts One and Three of the indictment (for a summary of which see *ante,* 316 F.Supp. pp. 1151, 1152). For the reasons out-

lined below, the motion will be denied as to Count One and granted as to Count Three.

The first count, charging a conspiracy, alleges a number of overt acts described generally as having occurred "in the Southern District of New York, the District of Columbia, and elsewhere * * *." The ambiguity of the quoted language is largely or wholly cured by the first bill of particulars, which specifies overt acts asserted to have been performed in this District. This is, for the present at least, sufficient to defeat the claim that venue cannot be shown here. Hyde v. United States, 225 U.S. 347, 362–364, 32 S.Ct. 793, 56 L.Ed. 1114 (1912);[1] United States v. Downing, 51 F.2d 1030, 1031 (2d Cir. 1931); United States v. Valle, 16 F.R.D. 519, 522 (S.D. N.Y.1955); and see United States v. Miller, 381 F.2d 529, 534 (2d Cir. 1967), cert. denied, 392 U.S. 929, 88 S.Ct. 2273, 20 L.Ed.2d 1387 (1968).

■ The particulars supplied for Count Three, on the other hand, serve to support the opposite conclusion, which was already indicated by the allegations of the indictment itself. This charge, it may be recalled, is that Sweig (aided and abetted by Voloshen) "[o]n or about the 7th day of May 1969, in the Southern District of New York, the District of Columbia, and elsewhere, [being] then and there an officer and employee of the United States, * * * otherwise than in the proper discharge of his official duties, * * * did act as an agent and attorney for the Parvin/Dohrmann Company before * * * the Securities and Exchange Commission * * *." Despite the reference to "the Southern District of New York, the District of Columbia, and elsewhere," the bill of particulars focuses the key fact that when Sweig is alleged to have "acted" on or about May 7, 1969, before the S.E.C., the conduct occurred in the of-

---

1. *Hyde* was decided by a 5–4 vote. The allegations of the indictment and the bills of particulars bring the present case clearly within the majority's position. The same allegations indicate that the proof at trial may well show proper venue under the more restrictive test of Mr. Justice Holmes' dissent. See 225 U.S. at 388–390, 32 S.Ct. 793. Of course, the entire question remains open until proper venue is established at trial.

fices of that agency in the District of Columbia. And that, despite some preparatory happenings in New York or "elsewhere," would seem decisive for purposes of venue.

Resisting such a conclusion, the Government urges that the offense of "acting" as an "agent," since it involves a "relationship," should properly be treated as a "continuing" one within 18 U.S.C. § 3237. To implement this view, reliance is placed upon the allegations that Voloshen recruited Sweig for the unlawful business by actions in and from New York, particularly a telephone call from this City to Sweig (who was in Washington) on May 5, 1969. Further, it is argued, the subject matter of the unlawful acts as agent was trading in Parvin/Dohrmann stock, "a principal locus" of which was New York City. These thoughts imply expansive notions of venue that cannot be squared with the essential premises underlying the Constitution's confinement of federal criminal trials to the State and district where the wrongs allegedly occurred. U. S.Const. Art. III, § 2, and Amendment VI.

■ The fact that preparations, even essential ones, may take place "elsewhere," and that effects may radiate widely, does not render a discrete and identifiable wrong "continuing" so as to give the prosecution a choice of two or more districts in which to prosecute. Travis v. United States, 364 U.S. 631, 81 S.Ct. 358, 5 L.Ed.2d 340 (1961); Burton v. United States, 196 U.S. 283, 25 S.Ct. 243, 49 L.Ed. 482 (1905); Krogmann v. United States, 225 F.2d 220, 227 (6th Cir. 1955); Reass v. United States, 99 F.2d 752, 754 (4th Cir. 1938). While the cited cases involved statutes other than the one that concerns us here, the principles they serve to define and illuminate seem plainly to govern the present situation. Indeed, to elaborate only slightly, the want of venue in the instant case would appear to follow *a fortiori* from the reasoning and result

in Travis v. United States, *supra*. There, charged with a violation of 18 U.S.C. § 1001—forbidding the making of any false statement in any matter "within the jurisdiction" of a federal agency—defendant was shown to have executed in Colorado, and mailed from there to Washington, D. C., the affidavit for which he was tried. Although all that defendant did happened in Colorado, it was held that venue could lie only in the District of Columbia because under the statutory pattern in that case (a since-repealed affidavit requirement of the National Labor Relations Act, implemented by the sanctions of 18 U.S.C. § 1001), the offense could only happen if and when the false affidavit was filed with the agency. Here, where Sweig appears to have done no pertinent thing in New York, and where his "acting" as agent was in Washington, a comparable result follows readily. Under both the indictment and the statute, "the essence of the offense," Krogmann v. United States, *supra*, 225 F.2d at 227, is obviously the appearance before the agency.

The Government appears to rely upon the unquestionably sound proposition that venue may lie *as to the accessory* where the principal is claimed to have committed the wrong. United States v. Gillette, 189 F.2d 449, 451–452 (2d Cir.), cert. denied, 342 U.S. 827, 72 S.Ct. 49, 96 L.Ed. 625 (1951). But the attempt to turn the proposition around is not only dubious as a matter of logic; it is also bad law. United States v. Bozza, 365 F.2d 206, 220–222 (2d Cir. 1966).

■ The Government goes on to say that "it would argue Sweig participated in the accessorial acts which were committed in the Southern District of New York * * *."[2] Read with the bill of particulars, the quoted language would appear to refer solely to the telephone call placed by Voloshen in New York to Sweig in Washington on May 5, 1969. Passing the debatable premise that this could be deemed "participation" by Sweig in an accessorial act in New York, the

**2.** Memorandum in Opposition to Motion to Dismiss, p. 6.

point cannot save the day for the Government in any event. It is true that an *accessory* may be prosecuted both in the place where the principal commits the crime and in any different place "where defendant's own accessorial acts [are] committed * * *." United States v. Bozza, *supra* at 221. But, as is demonstrated by the opinion from which the last-quoted language comes, and upon which the Government erroneously relies here, this does not authorize prosecution of *the principal* in a venue different from that in which the crime occurs merely because this different venue is the location of "accessorial" conduct by such a principal.[3]

 Most crimes are planned before they are perpetrated. The planning

presumably comprises or involves "accessorial acts." If the Government may choose to prosecute the same defendant either as an accessory where he planned the crime, or as a principal where he committed it, there is nothing left of the doctrine which does not allow prosecution of non-continuing offenses where the preparations took place. Thus, a principal's accessorial acts are part of the crime, for venue purposes, only if the crime is deemed a continuing offense. It is only the defendant who is charged solely as an accessory who may be tried where his accessorial acts took place, because that is the place where *his* non-continuing crime was committed.[4]

 If the question of venue were more doubtful, there would be reasons

3. In *Bozza* a number of defendants were charged with numerous crimes centering upon the robbery of stamps from post offices in New Jersey. Count 26 charged one DeLutro as principal and others as accessories in receiving the proceeds of one robbery. While he was passing through the Eastern District of New York (Brooklyn) for an unspecified reason, DeLutro made a telephone call to the Southern District of New York (Manhattan) during which he agreed to purchase some of the stamps and bargained about the price. This preparatory activity was similar to that with which Sweig is charged in the present case, but it grounded a stronger argument for venue in the Eastern District because DeLutro himself was there and placed, rather than received, the call. Trial was had in the Eastern District. The court held that the "receiving" was a non-continuing crime, " 'a single act, which occurs at one time and at one place in which only it may be tried, although preparation for its commission may take place elsewhere.' " *Id.* at 220, quoting Reass v. United States, *supra*, 99 F.2d at 754. The charge against DeLutro was dismissed on the appeal for lack of venue. *Id.* 365 F.2d at 221.

In Count 4 of *Bozza* defendant Polak was charged as principal and defendant Bozza as accessory in receiving the proceeds of a second robbery. Both Polak and Bozza had participated in a number of planning meetings in the Eastern District, but the actual "receipt" had again taken place in the Southern District. The court held venue proper as to defendant Bozza, the accessory, and, in considered dictum,

held that venue would have been improper as to Polak, the principal, had he not pled guilty:

"Although Frank Polak lived in the Eastern District and engaged in more preliminary activities there than did DeLutro, whose presence in Brooklyn on the occasion of the telephone call appears to have been only accidental, we accept that, for reasons just stated [concerning DeLutro], Polak could have been tried for receiving only in the Southern District of New York. However, Bozza himself engaged in various accessorial acts in the Eastern District, and at common law could have been tried for them there, and indeed only there." *Id.*

4. It makes no difference, at least in this case, that "[o]ne indicted as a principal may be convicted on evidence showing that he merely aided and abetted." United States v. Russo, 284 F.2d 539, 540 n. 1 (2d Cir. 1960). Only Sweig could have acted as principal in this non-continuing crime. There is no allegation that any other official appeared as agent for Parvin/Dohrmann before the S.E.C. If Sweig is not a principal, no one is, and no crime was committed. "18 U.S.C. § 2 does not define a crime; rather it makes punishable as a principal one who aids or abets the commission of a substantive crime. There can be no violation of 18 U.S.C. § 2 alone * * *." United States v. Campbell, 426 F.2d 547, 553 (2d Cir. 1970); United States v. Brown, 335 F.2d 170, 172 (2d Cir. 1964); United States v. Provenzano, 334 F.2d 678, 691 (3d Cir.), cert. denied, 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964).

of practicality and constitutional policy for resolving the doubt in defendant's favor. United States v. Cores, 356 U.S. 405, 407, 78 S.Ct. 875, 2 L.Ed.2d 873 (1958); United States v. Johnson, 323 U.S. 273, 276, 65 S.Ct. 249, 89 L.Ed. 236 (1944); United States v. Bozza, *supra*, 365 F.2d at 221. As matters stand, the court finds compelling reason for granting defendant Sweig's motion to dismiss Count Three for want of venue.

In the particular circumstances of the case, this conclusion does not necessarily and neatly end the subject. Considering Count Three alone, the prosecution may still proceed on this accusation against defendant Voloshen, who has not questioned the venue as to himself and evidently could not in view of the allegations charging him with accessorial acts in this District. United States v. Gillette, *supra*, 189 F.2d 449 at 451. But the Count does not stand alone. In the trial scheduled to begin a month hence, defendant Sweig remains an accused in the first (conspiracy) count as well as in Counts Four through Twelve charging him with perjury. If Count Three is to be tried at the same time against Voloshen as an alleged aider and abettor, there is in that prospect an element of conceivable prejudice against Sweig. The problem inheres in the requirement that the jury must first determine that the crime was committed by Sweig as principal, though the count has been dismissed as to him, before it may proceed to determine whether Voloshen may be convicted for aiding and abetting.

It would appear on this basis that although Count Three stands as against Voloshen, trial of this count should be severed from the trial of the others. But further considerations weigh powerfully in the direction of a different conclusion. Most or all of the alleged facts giving rise to Count Three are included either as alleged parts of the conspiracy or overt acts under Count One. Thus, whether or not he remains as a defendant in Count Three, Sweig faces the prospect that his alleged conduct giving rise

to it will be placed before the jury. And this suggests two further thoughts:

(1) The supposedly possible prejudice to Sweig from trying Voloshen on Count Three in the joint prosecution may be more formal than substantial, amounting only to a concern over whether the proposed evidence is tendered to show a "crime" so labeled or merely the "facts" constituting the same wrong.

(2) It may be that Sweig, having failed in his applications for more extensive relief, enjoys no practical benefit from procuring a dismissal of Count Three now, facing trial here on the remaining counts, and creating the possibility of a further trial later on under a new indictment in the District of Columbia. And Sweig is free, of course, to waive his objections to the venue here.

These speculations are left unresolved for a brief time so that the court may have the benefit of counsel's views. Following our forthcoming pretrial conference an order will be made in accordance with the above conclusions regarding venue.

### ON MOTION TO DISMISS PERJURY COUNT

Defendant Voloshen, charged with perjury in Count Fifteen, moves to dismiss it, "pursuant to Rules 7(c) and 12(b) * * * for failure to state a crime and for failure to constitute a plain, concise and definitely written statement of the essential facts constituting the offense charged * * *." The count charges that this defendant, on August 19, 1969, appeared before a grand jury and gave the following testimony, knowing it to be untrue:

"Q And a doctor from Dayton.

"A I didn't consider that a criminal matter.

"Q It was a criminal matter.

"A Well, I didn't consider it a criminal matter, so I want to qualify

my answer. Wait a minute, Mr. Rooney, let me make it crystal clear to you, Mr. Rooney and Ladies and Gentlemen of this Jury; these people came to me after they had been indicted. You know that, don't you.

"Q And what were they?

"A You just repeated it, Bello and Gilbert. I don't consider Dr. whatever his name out there a criminal matter. I didn't represent him.

"Q What did you consider it?

"A He was an indicted man."

A bill of particulars narrows the focus to the second and fourth of the quoted answers, and states that these "are false in that Dr. and Mrs. Irving Helfert met with Voloshen prior to the filing of formal criminal charges against Irving Helfert."

The extract from the grand jury transcript upon which this fifteenth count rests has a ragged and fragmentary look when read alone and out of context. The second answer, seemingly the heart of the matter, is scarcely responsive— and, indeed, could not be responsive in any orthodox sense to the preceding "Q." which is an assertion rather than a question.

The particulars which are addressed narrowly and specifically to this count do not appear upon initial inspection to help it. It is asserted in these that Voloshen's grand jury testimony was false because in fact Dr. and Mrs. Helfert "met with Voloshen" before the doctor's indictment. But Voloshen did not in terms say—and he surely was not asked during the quoted colloquy—when he had *met* the Helferts. He told at most when "these people came to [him]" in connection with the criminal prosecution. His isolated and volunteered statement to this effect could readily be deemed consistent with his having "met with" the Helferts earlier.

By reference, however, to the somewhat fuller context, this innocent reconciliation (at least in terms of what may be seen to be alleged, which is the only thing before us at the moment) is made less plausible. The particulars supplied for Count One assert in detail that the Helferts called Voloshen on March 30, 1968, because they feared a "possible indictment," that they were invited to meet with him thereafter, bringing $5,000 in cash, and that there was such a meeting the next day at which the doctor "paid defendant Voloshen $5,000 in cash in connection with the income tax evasion matter then pending before the Internal Revenue Service and the United States Attorney, Dayton, Ohio." While these particulars are not incorporated by reference under those addressed to Count Fifteen, it would be a piece of sterile formalism to ignore their direct pertinence to the subject before us.

Other contextual items that seem relevant here appear elsewhere in Voloshen's grand jury testimony. During his appearance on an earlier day of the same inquiry, on August 5, 1969, he was made explicitly aware of the grand jury's interest in whether he had (1) ever taken cash payments for (2) seeking "to get somebody in the Government to not prosecute a case * * * [or to get] somebody in the Government not to have an indictment returned against somebody * * *."[1] On the subsequent day directly in question, he expressed a specific desire to return to the subject of criminal cases, indicating that his mind had been burdened by personal troubles during the preceding session.[2] He then proceeded to plead his privilege against self-incrimination concerning a number of questions in this area, including, evidently, questions about the Helferts.[3] But the foregoing facts were part of the setting in which he thereafter took pains, apparently volunteering, to "make it crystal clear to * * * this Jury; these people came to me after they had

1. Transcript, August 5, 1969, p. EJC–2.

2. *Id.*, August 19, 1969, p. RSK–4.

3. See *id.*, p. SA–7.

been indicted." And then, in a statement dubiously responsive at best: "He was an indicted man."

The questions as to particular "criminal" matters before indictment (or after conviction) were part of an overall inquiry into suspicions of one kind or another about supposed "influence peddling." In that light, even if the point had not been made explicit by earlier questions and answers, it may well be supposed to have been vividly in the mind of one familiar (as Voloshen was) with informal procedures that the grand jury's special interest would center upon the times before and after, rather than during, formal criminal proceedings.

■ Read in their setting, the allegations of Count Fifteen seem sufficient to withstand defendant's contention that they fail "to constitute a plain, concise and definitely written statement of the essential facts constituting the offense charged * * *." The allegedly perjurious statements are given exactly. Even without the particulars later supplied, the defendant's assertion to the grand jury (emphasized by repetition) that the people in question came to him *after indictment* was evidently a central feature of the briefly quoted extract. To be sure, the extract left open whether additional or different propositions to which Voloshen had sworn were alleged to have been false. But it is a legitimate office of a bill of particulars to supply the narrowing specificity by which this defendant is now enlightened. United States v. Caine, 270 F.Supp. 801, 805 (S.D.N.Y.1967); see United States v. Universal Camera Corp., 344 U.S. 218, 225, 73 S.Ct. 227, 97 L.Ed. 260 (1952); United States v. Brown, 335 F.2d 170, 172 (2d Cir. 1964); United States v. Wora, 246 F.2d 283, 286 (2d Cir. 1957).

■ The argument that Count Fifteen fails to state a crime, while the court is not now persuaded to sustain it, has stirred concerns that will require further study and discussion as the case proceeds. Government counsel dismiss as inconsequential the fact, stressed in this connection by the defense, that the allegedly perjurious statements were not responsive to questions put by the Assistant United States Attorney conducting the interrogation. The court is less certain that this is a trivial matter. It is surely the case normally that the obligation of a witness before the grand jury is "to tell what he knows *in answer to questions framed for the purpose of bringing out the truth of the matter under inquiry*." Carroll v. United States, 16 F.2d 951, 953 (2d Cir.), cert. denied, 273 U.S. 763, 47 S.Ct. 477, 71 L.Ed. 880 (1927) (emphasis added). An answer that is non-responsive may reflect only a misunderstanding, not perjury. United States v. Cobert, 227 F.Supp. 915, 919 (S.D.Cal.1964). Or, since the best way to know what the grand jury deems material is by hearing what it asks about, a non-responsive answer may represent only a gratuitous falsehood rather than the kind of "wilfully" untrue statement about a "material matter" denounced by the pertinent statute, 18 U.S.C. § 1621. Possibilities like these, while they may not defeat the indictment, may become matters of interest in deciding ultimately whether the case should go to the jury—or, if it should, what issues should be presented to that body.

■ It may be questionable whether the subject of materiality should enter into these speculations about the jury's potential concerns since it is familiar learning that materiality under the perjury statute is a question of law for the court, not a "fact" to be proved to the jury. E. g., United States v. Marchisio, 344 F.2d 653, 665 (2d Cir. 1965). It is at least doubtful, however, whether a defendant may be convicted of the *willful* offense of perjury if he has been led to consider the particular topic immaterial—or at least of no special consequence in the proceeding at which he testifies.

■ The problem of how to treat "materiality" as it may bear upon the issue as to willfulness in the circumstances of this case remains an open one

for this court. In the familiar run of cases, disputes about materiality arise, not because the subject in issue was not put to the alleged perjurer by his questioner, but because there is disagreement about the legal definition of the interrogating agency's (grand jury's, legislative committee's, etc.) actual or permissible concerns. In such usual cases, the materiality of *the answer* is not at issue. "No matter how right the witness might be in believing that the answer would not contribute to the investigation, he [is] bound to leave that decision to the tribunal. A question is 'material,' no matter what the answer may be, unless it appears by its terms that the answer cannot be 'material.'" United States v. Siegel, 263 F.2d 530, 533 (2d Cir.) (L. Hand, J.), cert. denied, 359 U.S. 1012, 79 S.Ct. 1147, 3 L.Ed.2d 1035 (1959). Thus, to take a lively case upon which the government relies here, it was perfectly plain that Mr. Carroll was asked more than once whether a naked lady had entered the bathtub on the stage in the party leading to Mr. Carroll's troubles in Carroll v. United States, *supra*, 16 F.2d 951. The issue as to materiality arose because of the arguable assertion that a grand jury exploring Prohibition Act violations could not be thought to have had a strictly-business interest in the truth about such a public show of devotion to cleanliness. The decision—that materiality was shown because the bather, if she was there, would be able to tell whether the tub was filled with something more potent than water—rested upon a legal characterization of the concerns the interrogator had conveyed clearly and explicitly to Mr. Carroll by his questions in the grand jury room.

Here, however, where the disputed topic was undoubtedly within the grand jury's province, the possible difficulty arises because the specific point was not presented sharply, and at the critical time, to the witness now charged with perjury in his volunteered answers. In such a context, "willfulness" and "materiality" may not be wholly separable. Whether or not the spontaneous answer fits the definition of materiality in that it "has a natural effect or tendency to influence, impede, or dissuade the grand jury from pursuing its investigation," Carroll v. United States, *supra*, 16 F.2d at 953, could be significant to a fact-finder weighing willfulness. Indeed, it may well be that "[o]nly by a full understanding of the issues * * * [before the grand jury] at the time the alleged perjury was committed can the jury determine the willfulness of the defendant in giving his testimony." Harrell v. United States, 220 F.2d 516, 520 (5th Cir. 1955); United States v. Letchos, 316 F.2d 481, 485 (7th Cir.), cert. denied, 375 U.S. 824, 84 S.Ct. 65, 11 L.Ed.2d 57 (1963). It would have been no great strain, obviously, to concentrate upon the point now said by the prosecution to have been material—namely, whether the defendant had been consulted by the Helferts about the tax difficulty *before indictment*— by putting a question posing the choice of answers unambiguously. On the other hand, if Voloshen, without such a question, knew he was speaking an untruth and understood from the prior questioning that the false testimony related to facts about which the grand jury was concerned, the absence of a specific question at that very stage of the interrogation would seem insufficient in itself to bar conviction.

 The court is, in short, of the tentative view that the questions generated by the instant motion to dismiss may require further exploration and development as the case proceeds to and through trial. As for the motion itself, however, for reasons which have been stated, it will be denied.

### ON MOTION FOR PHYSICAL EXAMINATION

 By notice dated May 22, 1970, defendant Voloshen moved for his examination by a physician to determine whether he "can stand trial, participate in the preparation and conduct thereof, be examined and cross-examined, etc., and whether the same would endanger his life, and for a hearing to be held at which

evidence may be adduced for the termination [*sic*] of issues of fact, if any, from this examination \* \* \*." The motion was supported by the reports of two physicians. Dr. Robert Lloyd Segal, who has had this defendant as a patient since 1955, reported that Voloshen has a history of gastrointestinal problems, two surgical operations for them, and a hiatus hernia with regurgitation. But the critical conclusions in his report for our purposes were in his opinion that

> "this 71-year-old man has angina pectoris, aortic stenosis, and coronary artery disease. Under emotional stress the coronary artery disease can and has in the past resulted in myocardial ischemia. Myocardial ischemia can if prolonged or severe cause myocardial infarction even death. These conditions, therefore, can be a threat to health and life. It will be aggravated as in the past by emotional stress and the likelihood of being in acute danger increases with emotional stress."

Dr. Simon Dack, a cardiologist to whom Dr. Segal referred Voloshen in November 1969, reported a similar diagnosis and expressed the opinion then—some six months before the problem was brought to the court's attention, cf. United States v. Bernstein, 417 F.2d 641, 642 (2d Cir. 1969)—that the stress of court hearings "would be extremely hazardous to his health and to his life."

In the face of this initial showing the government consented to the application for examination by a court-appointed physician. The parties agreed upon the selection for this purpose of Dr. Arthur C. DeGraff, Professor of Therapeutics at the New York University School of Medicine. Following his review of the history and examination of the patient, Dr. DeGraff agreed with the other two physicians on the general description of Voloshen's cardiac problems. He concluded, however, that the ailments were substantially less severe than Doctors Segal and Dack reported and that a criminal trial, though unquestionably posing risks, could probably be borne by Voloshen, under reasonable safeguards, without grave danger.

The court ordered an evidentiary hearing. The three physicians were heard, as were two F.B.I. agents who had observed Voloshen's activities over a period of a day and a half about a week earlier. Voloshen himself, after being absent from the first day of the hearing because of counsel's expressed view that his attendance would unduly endanger his health, was ordered to appear for the second and last day. In the course of that brief appearance lasting an hour or so, he was called as a witness in his own behalf to describe the limited nature of his current activities, his uses of medication, and his activities during the period of F.B.I. surveillance about which the two agents had testified.

Upon the record thus made, keenly aware of the urgent and vain wish for certainty at times like this, the court has concluded that the trial should proceed as scheduled on June 17, 1970, but under precautions hereinafter indicated.

That Mr. Voloshen is infirm as well as elderly cannot be doubted. As the three physicians agreed, his cardiac condition makes it possible that, like many others of comparable age and impairment, he could suffer a sudden attack and death at any time, quite apart from unusual stress such as a criminal trial will entail. This possibility will be enhanced, in some degree that is neither trivial nor precisely measurable, by the ordeal of a trial that is predicted to require some eight weeks for its completion. Weighing all the evidence, however, and considering all the interests at stake, the court finds that the increased risk, against which all appropriate safeguards will be provided, is not so severe as to bar trial of the pending charges.

It is clear that the choice confronting us is realistically between a trial and no trial, not between alternative times for going ahead. Whatever its severity, Voloshen's condition is almost certain to be progressive. If he is deemed unable to stand trial now, the determination will amount to a decision that he may

never be tried rather than a postponement to a later date. This can scarcely be a decisive thought; if the risk of a trial is unacceptably high now, then it cannot matter that the trial will be barred forever. Nevertheless, the degree of risk that may be "acceptable" could vary depending on whether the application is merely for delay to accommodate improving health or for a ruling that the trial is precluded by a condition likely to worsen rather than improve.

■ In the end, however, having regard for what is at stake, the court could not order Voloshen to trial if either (1) that experience in itself posed a high added risk of a severe blow to his health or death, or (2) his condition seemed inconsistent with effective participation in his own defense. But the evidence as a whole supplies reasonable reassurance; it is highly probable, in the court's view, that Voloshen will survive the trial with no drastically adverse consequences to his health and that he can, given a moderated pace and other adjustments to his condition, assist effectively in the defense. Granting their reality, Voloshen's ailments have been borne by him for a long time, through a course of active and energetic dealings in affairs of consequence. If his business has declined or disappeared in the last year or so, this is probably due more to the destructive impact of the indictment on the market for his services than to any marked decline in health beyond that likely to be worked by any year after age 70 in the life of a man who is not well.

A more precise statement of how the balance is struck would be desirable if it seemed possible. But the three physicians who testified refused, with wisdom and grace, to offer superficial comfort in the form of mathematical forecasts. The court takes its lead from their disclaimer of omniscience. Nevertheless, putting together all they said, weighing a man's health and possible dangers to his very life with all the sober solemnity owed to him and to each of us, considering the interest of the public and defendant himself in a resolution of the grave charges against him, and concluding that this defendant stands an excellent chance of surviving the trial with no serious further impairment of his health, the court will order that he stand trial.

The sanguine prediction about the outcome has been tested by, among other things, imagining the prospect of returning some day to these words after the prognostication should have proved erroneous. The possibility exists, of course, and it is not a happy thought. Even the prospective rationalizations are not thoroughly consoling. Having acknowledged that, the court adheres to the judgment herein stated.

As has been indicated, the court relies upon more than a detached forecast in making this decision. Extensive precautions are planned to ensure, so far as possible, that the ruling now made will have no untoward consequences, see United States v. Knohl, 379 F.2d 427, 437 (2d Cir. 1967):

(1) Subject to revisions dictated by daily experience, the court day and week will be somewhat abbreviated.

(2) Recesses will be as long and as frequent as necessary.

(3) It is expected that Voloshen will continue and adapt suitably, with medical advice, his existing regimen in matters of diet, rest and medication. Persuasive medical testimony indicates that Voloshen can continue use of tranquilizers and sedatives already prescribed for him, easing the impact of stress without impairing his power to think and assist at the trial.

(4) A place will be provided in the courthouse where Voloshen can lie down to rest or nap during the recess for lunch or at other times if necessary.

(5) The government will see that there is a trained nurse on hand, within steps from the courtroom. The court expects counsel to cooperate in seeing that this nurse is given suitable guidance and instruction, including a supply of medication for possible emergency use, by Voloshen's own physician.

(6) As this is written, the United States Attorney has also been instructed to explore with appropriate federal agencies, military and civilian, the possible availability of a physician to be assigned to this matter. The supplying of such a person has not been declared by the court to be a condition of proceeding with the trial. Obviously, however, a doctor on hand observing Voloshen could serve either to warn of impending difficulty or to treat promptly any bouts of distress. It is to be hoped, considering the relative rarity of such situations, that the resources of the Government of the United States allocable to the due administration of justice will be sufficient to satisfy this desideratum.

Finally, the court expresses the hope and the expectation that seasoned counsel for Voloshen (who is himself a lawyer by training and, to some unclear extent, a practitioner from time to time) will be able to supply a measure of perspective concerning the likely course and pace of events, and that this will aid in lessening the stress to which this defendant must be subjected. All the rest of us will have in mind this special concern, which adds to all the familiar reasons for making our courtrooms places where the search for truth may proceed with calm dignity.

Upon the basis outlined, the court concludes that defendant Voloshen is medically fit to proceed to trial as scheduled.