**Jaclynne M. O'NEILL, Petitioner,**

v.

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, Respondent.**

No. 99–3293.

United States Court of Appeals, Federal Circuit.

Aug. 8, 2000.

1356

Phillip R. Kete, Assistant General Counsel–Litigation, American Federation of Government Employees, AFL–CIO, of Washington, DC, argued for petitioner. With him on the brief was Mark D. Roth, General Counsel.

Terry M. Petrie, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for respondent. With him on the brief were David M. Ogden, Acting Assistant Attorney General; David M. Cohen, Director; and James M. Kinsella, Deputy Director.

Before SCHALL, Circuit Judge, ARCHER, Senior Circuit Judge, and BRYSON, Circuit Judge.

BRYSON, Circuit Judge.

The Department of Housing and Urban Development (HUD) removed Jaclynne M. O'Neill from her position based on four charges: acting as an agent of a private party before a government agency, in violation of 18 U.S.C. § 205(a)(2); misusing government property; delaying the completion of a work assignment; and engaging in disrespectful or insolent behavior toward a supervisor. On Ms. O'Neill's appeal from her removal, the Merit Systems Protection Board upheld the agency's action. We disagree with the Board's interpretation of 18 U.S.C. § 205(a)(2), and on that basis we hold that the charge that Ms. O'Neill acted as an agent of a private party before a government agency cannot be sustained. We affirm the removal action, however, because it is supported by other charges against Ms. O'Neill that the Board upheld and because those charges are sufficient under the circumstances to justify the penalty of removal.

I

Ms. O'Neill worked as a GS–6 Typing Clerk in the Office of Lead Hazard Control at HUD. In the spring of 1996, Ms. O'Neill began contacting various officials at HUD and the Department of Defense (DOD) to

urge them to look favorably on a housing proposal by a non-profit organization called Altamont Program, Inc. Altamont was interested in acquiring military housing at Griffiss Air Force Base in upstate New York, which was scheduled to be closed. Altamont intended to use the housing to provide shelter for homeless men. To that end, Altamont submitted a proposal to the government in accordance with the Base Closure Community Redevelopment and Homeless Assistance Act.

Under the Act, DOD and HUD have the responsibility, along with the Local Redevelopment Authorities (LRAs) and representatives of the homeless, for planning and implementing the conversion of military installations that Congress has approved for closure or realignment. DOD and HUD provide guidance to the LRAs in developing plans for converting the installations to other uses. After an LRA submits its plan for a particular installation, HUD reviews it. If HUD approves the plan, it submits the plan to DOD, which disposes of the property in accordance with the approved proposal. *See* 24 C.F.R. pt. 586.

On May 6, 1996, Ms. O'Neill sent an interoffice electronic mail (e-mail) message to Maxine Griffith, HUD's Secretary's Representative in New York, expressing the concern of "several of us who are affiliated with the area" over the possibility that the military housing at Griffiss would be demolished. She suggested that the housing be used to "replace slum housing that is occupied in the city" and also mentioned "a priest in Albany [who] has a project involving the homeless that he seeks to run out of the facility." The e-mail concluded by asking, "Can you help us?"

A few days later, John Heimbach, a Community Development Representative for HUD who was the base closure coordinator for Griffiss, telephoned Ms. O'Neill. Mr. Heimbach had received a copy of the e-mail message Ms. O'Neill had sent to Ms. Griffith. Ms. O'Neill told him she was working with other HUD officials (including HUD Secretary Andrew Cuomo) on base closure activities and asked him for information on base closure regulations.

In June or July of 1996, Ms. O'Neill made several telephone calls and sent e-mail messages to Patricia Woolfrey, a housing specialist with the Department of the Air Force Base Conversion Agency who had responsibility for the closure of Griffiss. Ms. O'Neill asked why the Griffiss housing was not being offered to the homeless. In July or August 1996, Ms. Woolfrey and Allen Olsen, the director of the Base Conversion Agency, met in person with Ms. O'Neill. Ms. O'Neill asked the DOD officials at the meeting to reconsider the proposal of a homeless group in New York. When Mr. Olsen asked Ms. O'Neill who she was representing, she replied that she worked for HUD but was acting as a private citizen representing a group of homeless men in upstate New York. When Mr. Olsen advised Ms. O'Neill to work with the LRA, Ms. O'Neill replied that she had tried that already but was unhappy with the results. Ms. Woolfrey later testified that Ms. O'Neill asked the DOD officials to contact the LRA on behalf of Altamont and to reconsider the decision that DOD had already made. She added that Ms. O'Neill "went beyond just seeking information."

On September 23, 1996, Ms. O'Neill attended a workshop held by the Griffiss LRA on surplus property screening. She signed in at the workshop as being with the "Altamont Pgm." In the following months, Ms. O'Neill had several more conversations with Mr. Heimbach about the closure of Griffiss. During a conversation in early February 1997, Ms. O'Neill told Mr. Heimbach she was calling from the offices of Altamont. She said that Altamont had submitted a proposal to the LRA for the use of part of the facilities but that the LRA had considered the proposal insufficient. She asked Mr. Heimbach to contact the LRA and urge it to look more favorably on Altamont's proposal.

In early February 1997, Ms. O'Neill telephoned William Poythress, the national coordinator of HUD's Headquarters Base Redevelopment Team. Ms. O'Neill told him that she was working with Altamont, with the permission of HUD officials, to help Altamont obtain use of the Griffiss facilities. She told him that the LRA was reluctant to accept Altamont's proposal and that HUD should not approve a redevelopment plan that did not incorporate Altamont's proposal. Mr. Poythress testified that Ms. O'Neill "advocated very heavily" for Altamont. After speaking with Ms. O'Neill, Mr. Poythress consulted the ethics office of HUD about Ms. O'Neill's actions regarding Altamont's proposal. Based on the advice of the ethics office, he instructed her to cease her activities on Altamont's behalf.

In August 1997, the agency issued a notice of proposed removal to Ms. O'Neill. Based on her contacts with government officials concerning Altamont, the agency charged Ms. O'Neill with four specifications of violating 18 U.S.C. § 205(a)(2), which prohibits a federal employee from acting, other than in the proper discharge of her official duties, "as agent ... for anyone before any department[ ][or] agency ... in connection with" a proceeding in which the United States is a party or has a substantial interest. Specifically, the agency charged Ms. O'Neill with representing Altamont before HUD, DOD, or the LRA based on the following conduct: (1) the e-mail message sent to Ms. Griffith; (2) the conversations with Mr. Heimbach in mid–1996 and February 1997; (3) the conversation with Mr. Poythress; and (4) the telephone, e-mail, and in-person contacts with Ms. Woolfrey and the in-person contact with Mr. Olsen.

The agency also based the proposed removal on three other charges: (1) misuse of government property, consisting of Ms. O'Neill's use of HUD's computer and telephone systems to send or receive messages and have conversations concerning Altamont's proposal, a non-work related matter; (2) delay in completing a work assignment, based on Ms. O'Neill's six and one-half hour delay in completing a 30–minute typing assignment in February 1997; and (3) disrespectful or insolent behavior toward a supervisor, stemming from a February 1997 exchange with Ronald Morony, her immediate supervisor. After Mr. Morony asked her to complete a work assignment and stated that she should treat him with respect, Ms. O'Neill replied, "Respect must be earned and you don't deserve it," and she added, "You have no class, absolutely no class."

Ms. O'Neill was removed from her position as of February 20, 1998. She filed an appeal with the Merit Systems Protection Board, arguing that her removal could not be sustained on any of the four charges against her. The administrative judge found that HUD had proved each of the four charges by a preponderance of the evidence and concluded that removal was a reasonable penalty under the circumstances.

In holding that Ms. O'Neill had violated section 205(a)(2), the administrative judge upheld each of the specifications charging her with acting as an agent for Altamont before government agencies. The administrative judge rejected Ms. O'Neill's argument that the statute did not apply to her because she was not an "agent" of Altamont as that term is used in section 205(a)(2). Instead, the administrative judge ruled that a violation of section 205(a)(2) occurs "when an employee contacts an agency on behalf of an organization with respect to a matter in which the United States has an interest, such as the reuse of housing facilities on a closed military base." The administrative judge further concluded that Ms. O'Neill did not have permission to represent Altamont and noted that it was irrelevant that Ms. O'Neill intended to act as a private citizen, rather than as a HUD employee, during the alleged contacts.

The administrative judge also sustained the charge of misuse of government property, holding that there is no de minimis exception to the applicable standard of

conduct, 5 C.F.R. § 2635.704(a), which provides that "an employee has a duty to protect and conserve Government property and shall not use such property, or allow its use, for other than authorized purposes." In addition, the administrative judge found that the charges of delay in completing a work assignment and disrespectful or insolent behavior toward a supervisor were supported by a preponderance of the evidence. The first charge was supported by Mr. Morony's testimony, and the latter charge was supported by Mr. Morony's testimony and the written statement of another employee who was present during the exchange between Mr. Morony and Ms. O'Neill.

With respect to penalty, the administrative judge found that the charges of acting as an agent for a private party, misusing government property, and engaging in disrespectful or insolent behavior toward a supervisor each independently justified removal. As to the charge of engaging in disrespectful or insolent behavior toward a supervisor, the administrative judge noted that the Board has held that such conduct so undermines the efficiency of the service that removal is a reasonable penalty. Based in part on Ms. O'Neill's prior reprimand for disrespectful or insolent behavior and a prior suspension for delay in completing a work assignment—misconduct with which she was also charged in this action—the administrative judge concluded that the penalty imposed on Ms. O'Neill was within the bounds of reasonableness. The administrative judge's initial decision became the final decision of the Board when the full Board denied Ms. O'Neill's petition for review.

## II

On appeal, Ms. O'Neill does not deny that she contacted government officials concerning Altamont's proposal, as described above. Her defense is that she was not an "agent" of Altamont as that term is used in section 205(a)(2); that the government failed to prove that she had the requisite intent to violate that statute; and that the statute is unconstitutional as applied to her conduct. Because we hold that the agency failed to prove that Ms. O'Neill acted as an "agent" of Altamont within the meaning of section 205(a)(2), we address only that element of the statute and do not reach Ms. O'Neill's other arguments.

■ At the threshold, the government argues that in the proceedings before the administrative judge Ms. O'Neill failed to raise the legal argument that she was not an "agent" of Altamont within the meaning of the statute. In her submission to the administrative judge, however, Ms. O'Neill asserted that she "had no authority (agency) to conduct Altamont business." The administrative judge clearly understood her argument to be that the statute required proof that she was an authorized agent of Altamont. We conclude that Ms. O'Neill adequately preserved that argument for appeal, and we therefore turn to the merits of her contention.

Section 205 is one of a related group of conflict-of-interest statutes found in the criminal code at 18 U.S.C. §§ 202–209. It provides in pertinent part as follows:

(a) Whoever, being an officer or employee of the United States in the executive, legislative, or judicial branch of the Government or in any agency of the United States, other than in the proper discharge of his official duties—

. . . . .

(2) acts as agent or attorney for anyone before any department, agency, court, court-martial, officer, or civil, military, or naval commission in connection with any covered matter in which the United States is a party or has a direct and substantial interest;

shall be subject to the penalties set forth in section 216 of this title.

18 U.S.C. § 205(a)(2). The statute does not define the term "agent." Ms. O'Neill argues that in the absence of a special definition, the term must be given its common-law meaning and that her conduct does not render her an "agent" of Alta-

mont within the common-law meaning of that term. We agree.

■ It is a well-recognized principle of statutory construction that "[w]here Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *NLRB v. Amax Coal Co.*, 453 U.S. 322, 329, 101 S.Ct. 2789, 69 L.Ed.2d 672 (1981); *see also Neder v. United States*, 527 U.S. 1, 21–22, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999); *Evans v. United States*, 504 U.S. 255, 259–60, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992). That rule applies with particular force to criminal statutes because of the related principles that courts may not create crimes and that criminal statutes must be strictly construed in favor of lenity. *See Crandon v. United States*, 494 U.S. 152, 158, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990). Justice Jackson made that point, with characteristic elegance, in *Morissette v. United States*, 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952):

> The spirit of the doctrine which denies to the federal judiciary power to create crimes forthrightly admonishes that we should not enlarge the reach of enacted crimes by constituting them from anything less than the incriminating components contemplated by the words used in the statute. And where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them.

Section 205(a)(2) fits this model perfectly. It employs a term—"agent"—that has a well-established and long-standing common-law meaning. The statute contains no definition of the term indicative of a congressional purpose to vary from the common-law meaning. And it is a criminal statute, which thus must be given a narrow construction consistent with the rule of lenity.

On several occasions the Supreme Court has looked to the common law of agency to define the term "employee" when interpreting a statute in which that term is not otherwise defined. *See Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 741, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989) (concluding that, where the statute did not define term "employee," the term "should be understood in light of the general common law of agency"); *see also Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992); *Kelley v. Southern Pac. Co.*, 419 U.S. 318, 322–23, 95 S.Ct. 472, 42 L.Ed.2d 498 (1974); *New York Life Ins. Co. v. United States*, 190 F.3d 1372, 1380–82 (Fed.Cir.1999). We can discern no reason to treat the closely related term "agent," as used in section 205(a)(2), any differently.

■ Like the term "employee," the term "agent" has a well-settled common-law meaning. Agency "is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other to so act." *Restatement (Second) of Agency* § 1 (1958). An agent acting on behalf of his principal has the authority to "alter the legal relations between the principal and third persons," *id.* § 12, and a "principal has the right to control the conduct of the agent with respect to matters entrusted to him," *id.* § 14. Thus, proof of actual or apparent authority, *see id.* § 8, to act on behalf of the principal is necessary to establish that a person acts as an agent both under the common-law and, as we construe it, under section 205(a)(2).

Nothing in the language, context, or background of section 205(a)(2) suggests a different construction of the statute. As we have noted, the statute itself is silent as

to the definition of the term "agent." And rather than supporting the broad construction offered by the government, the background and statutory context of section 205(a)(2) support Ms. O'Neill's contention that the term "agent" must be construed narrowly, in accordance with its ordinary, well-established meaning.

The predecessor of section 205, 18 U.S.C. § 283 (1958), broadly prohibited "act[ing] as an agent or attorney for prosecuting any claim against the United States, or aid[ing] or assist[ing] in the prosecution or support of any such claim[.]" That broad language was replaced by the narrower language of section 205(a)(2), which limited the proscribed conduct to acting as an agent or attorney. A House Report on the 1962 legislation that substituted section 205(a)(2) for section 283 explained the reason for the change:

> The reason for limiting the disqualification to acting as attorney or agent is that the inclusion of the term "aids or assists" would permit a broad construction embracing conduct not involving a real conflict of interest. However, acting as attorney or agent, which could afford the opportunity for the use of official influence, would continue to be prohibited.

H.R.Rep. No. 87–748, at 21 (1961). The committee report thus makes clear that "aiding" or "assisting" a private party, without more, would not be sufficient to trigger section 205(a)(2). More importantly, the report reveals that the term "agent," as used both in the predecessor statute and in section 205(a)(2), was not meant to be construed so broadly as to include persons who provide aid or assistance for a third party without having the status of "agents" of that third party.

Support for a narrow construction of section 205(a)(2) can also be found in two other subsections of section 205. In subsections 205(d) and 205(e), the statute provides that nothing in subsection (a) prevents an officer or employee, under certain circumstances, "from acting without compensation as agent or attorney for, or otherwise representing" particular individuals or groups, including relatives. 18 U.S.C. §§ 205(d)(1), 205(e). Thus, within section 205 itself Congress used the terms "agent or attorney" to describe the statutory prohibition, but it used broader language— "acting … as agent or attorney for, or otherwise representing"—to describe the exemption from the prohibition. In light of Congress's choice of different language in subsections of the same statute, it would be inappropriate to construe the narrower language that Congress chose for the prohibition as if it were equivalent to the broader language that Congress chose for the exemptions. *See Keene Corp. v. United States*, 508 U.S. 200, 208, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993) (court has a "duty to refrain from reading a phrase into the statute when Congress has left it out"); *Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir.1972) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.")).

An examination of related conflict-of-interest provisions likewise indicates that Congress meant to distinguish between service as an agent and other representational services. For example, 18 U.S.C. § 203(a)(1) prohibits members of Congress and certain other government officials from accepting compensation "for any representational services, as agent or attorney or otherwise." That statutory language makes clear that Congress regarded service "as agent" to be a subset of all types of representational services, and that a person could be "otherwise" providing representational services without being an "agent" within the meaning of the statute. Another related statute, 18 U.S.C. § 207(a)(1), which applies to former federal officials and employees, does not use the term "agent" at all, but instead broadly prohibits making, with the intent to influ-

ence, "any communication to or appearance before any officer or employee" of specified government entities. Had Congress intended section 205(a)(2) to be read broadly enough to cover all communications to or appearances before governmental entities on behalf of a private party, it could have used broad language of the sort used in section 207(a)(1), rather than the more specific terms "agent or attorney" used in section 205(a)(2).

An earlier version of section 207 makes the same point even more clearly. The 1962 version of section 207, which was enacted together with section 205, made it unlawful for a former government employee to "knowingly act[ ] as agent or attorney" for any private party in a matter in which the employee participated during his employment. *See* Act of October 23, 1962, Pub.L. No. 87–849, § 1(a), 76 Stat. 1119, 1123 (amended 1978). Section 205 used the same language, penalizing any government employee who "acts as agent or attorney" in prosecuting any claim against the United States. *Id.,* 76 Stat. at 1122. In 1978, section 207 was amended to make it unlawful for a former government employee to "act[ ] as agent or attorney ... or otherwise represent[ ]" a private party in a matter in which the employee participated during his employment. *See* Ethics in Government Act of 1978, Pub.L. No. 95–521, § 501(a), 92 Stat. 1824, 1864 (amended 1989). The amended version of section 207 clearly distinguished between service as an agent and service in some other representational capacity. *See United States v. Coleman,* 805 F.2d 474, 479–80 (3d Cir.1986) (noting that the phrase "or otherwise represents" was intended to broaden the statute beyond professional advocacy activities to encompass "appearances in any professional capacity, whether as attorney, consultant, expert witness or otherwise" (quoting H.R. Conf. Rep. No. 95–1756, at 74 (1978), *reprinted in* 1978 U.S.C.C.A.N. 4381, 4390)). It is clear that the "otherwise represents" language in former section 207 was not simply redundant surplusage, because Congress amended section 207 for the specific purpose of

broadening the scope of the statute in that respect. At the same time, however, Congress left unchanged the "acts as agent or attorney" language in section 205. Congress's action with respect to section 207 (and its contemporaneous inaction with respect to the parallel provision, section 205) stands as strong evidence that Congress regarded representation as going beyond service as an agent or attorney, and that it meant for section 207, but not section 205, to reach such non-agency representational services.

These examples from among the federal conflict-of-interest statutes demonstrate that Congress has carefully and consciously distinguished between merely assisting, representing, or appearing before a federal agency on behalf of another party, on the one hand, and acting as agent or attorney for such a party, on the other. At a minimum, the differences in the elements of the offenses described in these related statutes show that Congress knew how to include the broader range of conduct within the scope of the conflict-of-interest provisions when it wished to. In that context, Congress's decision not to use such broad language in section 205(a)(2) strongly suggests that Congress intended that provision to have a narrower scope. *See Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.,* 484 U.S. 97, 106, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987).

Other courts have interpreted the term "agent," as used in section 205(a)(2) and section 207 in much the same fashion as we do. In *Refine Construction Co. v. United States,* 12 Cl.Ct. 56, 61 (1987), the Claims Court construed the term "agent" in section 205(a)(2) to mean "one who is authorized to act for another, or a business representative empowered to bring about contracts. In short, an agent is a person given the authority to speak or act on behalf of someone else." *See also United States v. Bailey,* 498 F.2d 677, 679 (D.C.Cir.1974) (concluding that law students supervised by an attorney in a student-advocacy program violated section

205(a)(2) because they were "subagents" appointed by attorney, who had the right to act as the client's agent, with the consent of the client). And in *United States v. Schaltenbrand*, 930 F.2d 1554 (11th Cir. 1991), the Eleventh Circuit construed the statutory phrase "act[ing] as agent" in 18 U.S.C. § 207 according to the common-law definition of agency, noting that "an essential characteristic of an agency is the power of the agent to commit his principal to business relationships with third parties." *Id.* at 1560 (citations and quotations omitted); *see also id.* at 1561 (rejecting the government's argument that Schaltenbrand had acted as an agent because there was no evidence that Schaltenbrand had actual or apparent authority to make any binding decisions on the supposed principal's behalf).

To support its contention that the term "agent" in section 205(a)(2) should not be restricted to its common-law meaning, the government points to two district court cases, *United States v. Sweig*, 316 F.Supp. 1148, 1157 (S.D.N.Y.1970), and *van Ee v. Environmental Protection Agency*, 55 F.Supp.2d 1, 7–8 (D.D.C.1999), *rev'd on other grounds*, 202 F.3d 296 (D.C.Cir. 2000). We do not find those decisions persuasive. The pertinent portion of the court's opinion in *Sweig* consists of a terse statement in dictum that "the strict common-law notion of 'agency' does not necessarily exhaust the meaning of the prohibition." 316 F.Supp. at 1157. The court was not required to convert that observation into a holding that Congress meant to criminalize conduct falling outside the scope of the well-established meaning of "agent." The district court in *van Ee*, in addition to citing *Sweig*, relied for its broad construction of the term "agent" on the decisions in *Refine Construction* and *Schaltenbrand*. *See van Ee*, 55 F.Supp.2d at 7. As discussed above, however, the courts in *Refine Construction* and *Schaltenbrand* construed the term "agent" in accordance with common-law agency principles, contrary to the approach taken by the court in *van Ee*.

Applying the well-settled common-law meaning of the term "agent," we conclude that the Board erred in finding that Ms. O'Neill acted as an agent under section 205(a)(2), because the government presented no evidence that Ms. O'Neill had actual or apparent authority to act on behalf of Altamont. In her submission to the Board, Ms. O'Neill claimed that Father Peter Young, the director of Altamont, would have testified at a hearing that Ms. O'Neill had no authority to conduct business on behalf of Altamont. The administrative judge, however, deemed such testimony irrelevant based on her conclusion that section 205 did not incorporate agency principles. The evidence offered by the government, and the findings of the administrative judge, established no more than that Ms. O'Neill purported to represent the interests of Altamont. The evidence did not establish, and the administrative judge did not find, that her purported representation was authorized, either actually or apparently. She was therefore not shown to have been an "agent" of Altamont in the sense that the term is used in the law of agency and in the sense that we understand the term to be used in section 205(a)(2). The Board therefore erred in concluding that Ms. O'Neill acted as an agent of a private party before a governmental agency, and her removal cannot be sustained on the ground that she violated 18 U.S.C. § 205(a)(2).

### III

We now turn to the question whether Ms. O'Neill's removal can be upheld based on the other charges against her. In the agency's removal letter, the deciding official "determined that removal is an appropriate penalty for any *one* charge of misconduct sustained in the proposal notice in order to promote the efficiency of the service" (emphasis in original). And the administrative judge concluded that the charges of misuse of government property and disrespectful or insolent behavior are

"serious offenses that could each justify removal on their own." Because both the agency and the Board have stated that removal would be appropriate on either of those charges standing alone, our task is simply to determine whether either of those charges would be sufficient to support the penalty of removal under the circumstances of this case.

Ms. O'Neill argues that her removal cannot be sustained on the remaining charges, because the administrative judge failed to make an explicit finding that the charged conduct adversely affected the efficiency of the service. *See* 5 U.S.C. § 7513(a) (providing that the agency may remove employee "only for such cause as will promote the efficiency of the service"). Ms. O'Neill also argues that the Board erred in failing to interpret 5 C.F.R. § 2635.704(a), on which the misuse-of-government-property charge was based, as including an exception for de minimis violations of the regulation.

 It is true that the fact-finder in an appeal from a removal action must find that there is a nexus between the charged conduct and the efficiency of the service. There is no requirement, however, that the finding of nexus be explicit. *See Girani v. Federal Aviation Admin.,* 924 F.2d 237, 242 n. 10 (Fed.Cir.1991) ("an arbitrator has no duty to make a specific finding that a removal under § 7513(a) is for the 'efficiency of the service' "). Although the administrative judge in Ms. O'Neill's case did not make an explicit finding of nexus, that finding is implicit in the administrative judge's decision. The administrative judge noted that "[t]he agency must ... prove that its action is for such cause as promotes the efficiency of the service and that the penalty is reasonable," and the administrative judge made her findings as to the appropriateness of the removal sanction in a section of her opinion entitled "Nexus and Penalty." In concluding that removal was appropriate, the administrative judge invoked a principle of Board law holding that insolent disrespect toward supervisors seriously interferes with an agency's fulfill-

ment of its mission, which constituted a clear reference to the required nexus between charged conduct and the efficiency of the service. Moreover, the evidence before the administrative judge included specific statements from the agency as to how Ms. O'Neill's particular conduct affected the efficiency of the service. Thus, the administrative judge's attention was focused on Ms. O'Neill's particular conduct and its impact on the efficiency of the agency, and it is implicit in the administrative judge's opinion that she concluded that Ms. O'Neill's conduct satisfied the nexus requirement.

 Ms. O'Neill's argument that the regulation concerning misuse of government property, 5 C.F.R. § 2635.704(a), must be read to have an implicit de minimis exception has some force. *See Wisconsin Dep't of Revenue v. William Wrigley, Jr., Co.,* 505 U.S. 214, 231, 112 S.Ct. 2447, 120 L.Ed.2d 174 (1992) ("[T]he venerable maxim *de minimis non curat lex* ('the law cares not for trifles') is part of the established background of legal principles against which all enactments are adopted, and which all enactments (absent contrary indication) are deemed to accept."). Even if we were to accept her position, however, Ms. O'Neill's removal could be sustained on the remaining charges of disrespectful or insolent behavior and delay in completing a work assignment, as to which there was no viable defense on the merits.

As noted by the administrative judge, the Board has consistently held that "insolent disrespect toward supervisors so seriously undermines the capacity of management to maintain employee efficiency and discipline that no agency should be expected to exercise forbearance for such conduct more than once." *Redfearn v. Department of Labor,* 58 M.S.P.R. 307, 316 (1993); *Carson v. Veterans Admin.,* 33 M.S.P.R. 666, 669–70 (1987) (same); *see Webster v. Department of the Army,* 911 F.2d 679, 688 (Fed.Cir.1990) ("The [administrative judge] properly noted that the [agency] 'cannot tolerate disrespectful con-

duct to a supervisor....'"); *Fonville v. Department of Health & Human Servs.,* 30 M.S.P.R. 351, 355 (1986) ("An agency is entitled to have an employee respect authority in the form of supervisors as well as rules and regulations, and an employee is expected to deport himself or herself in conformance with accepted standards."); *Hockman v. American Battle Monuments Comm'n,* 11 MSPB 246, 12 M.S.P.R. 642 (1982) (upholding removal of employee for insubordination where employee called his supervisor a "pathological liar," suggested that his supervisor obtain psychiatric assistance, and stated that his supervisor's actions made employees lose respect for him); *Jefferson v. Veterans Admin.,* 6 MSPB 297, 6 M.S.P.R. 348, 352 (1981) ("To expect management to tolerate ... repeated insolent behavior would make a mockery of management's authority and supervisory responsibility; few other types of misconduct go so directly to the heart of maintaining the 'efficiency of the service.'"). The employing agency was therefore entitled to take such conduct seriously.

Moreover, Ms. O'Neill had previously received an official reprimand for disrespectful or insolent behavior, which related to several incidents of misconduct toward a management official, coworkers, and her supervisor. In addition, in assessing the propriety of the penalty, the agency was entitled to rely on Ms. O'Neill's previous five-day suspension for delay in completing a work assignment. And the agency's notice of proposed removal set forth the details of what it referred to as her "employment history of behavior problems that demonstrate an overall disregard for Agency rules, supervisory authority, office visitors and [her] co-workers." Despite repeated instances of formal discipline and informal counseling, the notice stated that Ms. O'Neill's conduct had established "a pattern of misconduct which demonstrates a poor personal attitude in general about complying with work rules and respecting HUD employees and supervisory authority." The decision on the proposed removal reached the same conclusions, noting that Ms. O'Neill's employment history at HUD "depicts a pattern of misconduct which indicates that [she has] a propensity for disrespecting supervisory authority as well as for disrespecting [her] peers." The decision further noted that even after the issuance of the proposed removal notice, she had "continued to exhibit rude behavior and improper attitude towards [her] supervisors as well as towards [her] peers."

In light of the nature of the charges and the fact that the charges were part of what the agency characterized as a pattern of misconduct extending over several years, we cannot conclude that the penalty chosen in this case was "so harsh and unconscionably disproportionate to the offense that it amounts to an abuse of discretion." *Villela v. Department of the Air Force,* 727 F.2d 1574, 1576 (Fed.Cir.1984). Under these circumstances, the agency did not abuse its broad discretion in selecting the penalty of removal for Ms. O'Neill's misconduct on the job. *See Schapansky v. Department of Transp.,* 735 F.2d 477, 484 (Fed.Cir.1984).

*AFFIRMED.*

W. Frank **BOLING**, W.E. Gore, Jr., George Rayford Vereen, Hope Willard, in their behalf and on behalf of all other persons similarly situated; William D. Boling, individually, William D. Boling, as Trustee of the Agnes T. Boling Living Trust, and W. Frank Boling; Loy Ree B. Ballam; Clifton Bellamy; Beachwood Golf Corporation; Robert T. Darden, Sr., Mildred C. Darden, Danny Ross Moore, Sr., Martha R. Moore; Frank B. Clare, individually, Frank B. Clare, as personal representative of the Es-