NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2009-3050

JUAN R. CABRERA,

Petitioner,

v.

UNITED STATES POSTAL SERVICE,

Respondent.

Juan R. Cabrera, of Castro Valley, California, pro se.

Morgan E. Rehrig, Attorney, Civil Practice Section, Law Department, United States Postal Service, of Washington, DC, for respondent. With her on the brief was Lori J. Dym, Chief Counsel, Appellate Division. Also on the brief was Michael F. Hertz, Acting Assistant Attorney General, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC. Of counsel was Russell A. Shultis, Attorney.

Appealed from: Merit Systems Protection Board

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2009-3050

JUAN R. CABRERA,

Petitioner,

v.

UNITED STATES POSTAL SERVICE,

Respondent.

Petition for review of the Merit Systems Protection Board in SF0752080122-I-1.

_____

DECIDED: June 8, 2009

_____

Before BRYSON, GAJARSA, and PROST, Circuit Judges.

PER CURIAM.

## DECISION

Juan R. Cabrera petitions for review of a final decision of the Merit Systems Protection Board sustaining his removal from his position with the United States Postal Service. We affirm.

## BACKGROUND

Mr. Cabrera worked as a mail carrier in the Hayward-Castro Valley Post Office in Castro Valley, California. On October 24, 2007, the agency issued a notice removing him from his position based on two charges: unacceptable conduct and deviation from his postal route. Mr. Cabrera appealed his removal to the Merit Systems Protection

Board. After conducting a two-day hearing, the administrative judge assigned to the case sustained both charges and affirmed the agency's decision to remove Mr. Cabrera from his position.

The unacceptable conduct charge contained a single specification alleging that Mr. Cabrera had engaged in inappropriate sexual contact with a postal customer. The evidence showed that on June 13, 2007, Mr. Cabrera parked his mail truck across the street from Mandy Ilmberger's home on Lamson Road in Castro Valley. Mr. Cabrera then crossed the street, approached Ms. Ilmberger's house, and hand-delivered the mail to Ms. Ilmberger. According to Ms. Ilmberger, Mr. Cabrera handed her the mail in the doorway of her home, then stepped into the house, grabbed her by her right arm, and pushed her behind the front door. Ms. Ilmberger testified that while Mr. Cabrera held her by the arm, he kissed her with his mouth open and "shoved his tongue down my throat."

Ms. Ilmberger stated that after she pushed him away, Mr. Cabrera handed her a wrapped condom. Ms. Ilmberger gave the condom back to Mr. Cabrera and told him to leave. As Mr. Cabrera was walking away he stopped on the porch, turned to face Ms. Ilmberger, and said, "I'll see you tomorrow morning." Mr. Cabrera drove off in his delivery vehicle, but returned to Ms. Ilmberger's house about two minutes later and told her that she was "looking good" and reiterated that he would "definitely" see her the next morning. Ms. Ilmberger's neighbor, Kathy Christensen, testified that later that afternoon Ms. Ilmberger told her about the alleged incident involving Mr. Cabrera.

On the morning of June 14, 2007, Ms. Ilmberger placed a telephone call to a coffee shop owned and operated by her husband's family. Although she could not

reach her husband, Ms. Ilmberger told another employee at the coffee shop about the alleged incident; Ms. Ilmberger's brother-in-law also learned of the matter at that time. Shortly thereafter, Ms. Ilmberger's brother-in-law came to her house, picked up an aluminum baseball bat, and set out to find Mr. Cabrera. Mr. Cabrera stated that he was taking a break in his mail truck near Lamson Road when Ms. Ilmberger's brother-in-law drove up, exited his pickup truck brandishing the baseball bat, and accused Mr. Cabrera of "molest[ing]" Ms. Ilmberger. At the request of Ms. Ilmberger's brother-in-law, Mr. Cabrera followed him back to Ms. Ilmberger's house to speak with the police.

Meanwhile, Ms. Ilmberger called the Hayward Post Office and spoke with Dante Datu, a customer service manager. She told him that Mr. Cabrera had kissed her while delivering her mail the day before. Mr. Datu stated that during that telephone conversation, he heard yelling in the background; he therefore told Ms. Ilmberger to call the police, and he immediately left the Post Office to go to her home. Four sheriff's deputies were dispatched to Ms. Ilmberger's house. The deputies arrived there to find Mr. Cabrera, Ms. Ilmberger's brother-in-law, and Ms. Ilmberger. Mr. Datu then arrived, along with two other supervisors from the Post Office. Mr. Datu informed one of the deputies that Mr. Cabrera would be placed on administrative leave until the agency had completed its investigation into the matter.

Although Mr. Cabrera admitted that he had crossed Lamson Road to deliver the mail to Ms. Ilmberger on June 13, he testified that he stood on her front lawn and handed her the mail while she was on her porch. Mr. Cabrera asserted that he did not kiss Ms. Ilmberger or enter her house, but rather talked with her briefly about a piece of

misdirected mail and then proceeded along his postal route without any further contact with Ms. Ilmberger that day.

The administrative judge credited Ms. Ilmberger's version of events. He explained that he had observed Ms. Ilmberger at the hearing and found her testimony to be convincing, specific, highly detailed, and based on personal knowledge. He added that her testimony was consistent with the statements she had made to the Sheriff's Office, to Mr. Datu, and to the supervisor of customer services at Hayward Post Office. In contrast, the administrative judge was "unconvinced by the appellant's presentation" and found Mr. Cabrera's testimony to be inconsistent with the statement he had made to the Sheriff's Office. The administrative judge therefore sustained the agency's unacceptable conduct charge against Mr. Cabrera.

The agency also charged Mr. Cabrera with two specifications of deviating from his postal route in connection with the alleged sexual assault on Ms. Ilmberger. The first specification alleged that Mr. Cabrera had deviated from his route on June 13, 2007, when he crossed Lamson Road to hand-deliver the mail to Ms. Ilmberger immediately before the alleged assault. To maximize efficiency, the Postal Service automatically sorts mail according to a delivery point sequence corresponding to a mail carrier's prescribed delivery route. Typically, the delivery point sequence prearranges mail for delivery to one side of a street at a time so that mail carriers do not traverse the street in a criss-cross fashion when making their deliveries. Carriers are prohibited from deviating from their assigned route for any reason without specific managerial authorization.

Before Mr. Cabrera delivered the mail to Ms. Ilmberger on June 13, his vehicle was parked in front of 18124 Lamson Road, which was delivery number 176 along Mr. Cabrera's assigned postal route. Although Ms. Ilmberger's house was located just across the street at 18131 Lamson Road, her house was delivery number 240 on Mr. Cabrera's route. Mr. Cabrera therefore deviated from his postal route when he crossed the street to hand Ms. Ilmberger her mail.

Mr. Cabrera conceded that he had deviated from his route on June 13, but he argued that mail carriers routinely do so in order to hand-deliver mail to postal customers. Such deviations, Mr. Cabrera claimed, result in better customer service while adding only a negligible amount of time to the carrier's overall route. The administrative judge explained that while he had "no reason to doubt that individual carriers believe that specific customers are better served by such deviations, it is undisputed that the appellant's actions on June 13, 2007 with regard to 18131 Lamson involved a deviation from his known route." The administrative judge therefore concluded that Mr. Cabrera had deviated from his postal route without authorization.

The second specification to the charge alleged that Mr. Cabrera had deviated from his assigned route on June 14, 2007. After the alleged incident with Ms. Ilmberger, Mr. Cabrera's supervisor removed Lamson Road from his postal route, instructed him to remove any mail addressed to Lamson Road from his mail truck, and assigned those deliveries to another mail carrier. Because Lamson Road was not on Mr. Cabrera's postal route for that day, Mr. Cabrera had no reason to be on Lamson Road. However, Ms. Christensen testified that on the morning of June 14, she observed Mr. Cabrera make repeated U-turns in front of Ms. Ilmberger's house. Mr. Cabrera then parked his

truck nearby, where his subsequent run-in with Ms. Ilmberger's brother-in-law occurred. Mr. Cabrera returned to Lamson Road when he was forced to accompany Ms. Ilmberger's brother-in-law back to her house.

Mr. Cabrera did not contest that he deviated from his route on June 14. Rather, he testified that he inadvertently drove by Ms. Ilmberger's house after becoming disoriented while attempting to deliver two letters to another address on Lamson Road. The administrative judge discounted that explanation, noting that Mr. Cabrera should not have even possessed—much less tried to deliver—any mail to Lamson Road because Lamson Road was not on his postal route for that day. To the extent that Ms. Christensen's testimony that Mr. Cabrera made multiple U-turns in front of Ms. Ilmberger's house conflicted with Mr. Cabrera's story, the administrative judge credited Ms. Christensen's testimony, which he found to be unequivocal, specific, and detailed.

Mr. Cabrera further argued that he later returned to Ms. Ilmberger's house involuntarily because he was forced to do so by Mr. Ilmberger's brother-in-law, who had threatened him with a baseball bat. The administrative judge found Mr. Cabrera's explanation that he felt compelled to comply with the demands of Ms. Ilmberger's brother-in-law "questionable" in light of the fact that Mr. Cabrera was in a separate car and could readily have called the police or simply driven away if he was afraid. The administrative judge therefore concluded that Mr. Cabrera deviated from his route on June 14, 2007, first when he circled in front of Ms. Ilmberger's house, and then again when he returned to her house at the behest of her brother-in-law.

In addition to sustaining both charges against Mr. Cabrera, the administrative judge found that the agency demonstrated a nexus between the sustained charges and

the employee's ability to perform his duties satisfactorily.  See Pope v. U.S. Postal Serv., 114 F.3d 1144, 1147 (Fed. Cir. 1997).  Noting that the deciding official had considered the relevant Douglas factors, the administrative judge also found that the agency reasonably exercised its discretion in imposing the penalty of removal.  See id.; Douglas v. Veterans Admin., 5 M.S.P.R. 280, 305-07 (1981).  After the full Board denied Mr. Cabrera's petition for review, he filed a petition for review by this court.

## DISCUSSION

Mr. Cabrera has failed to demonstrate any error in the Board's decision sustaining his removal.  He asserts that the administrative judge erred by concluding that he had "lied about being on break and delivering the mail" and in finding that only his testimony, and not that of the other witnesses, was inconsistent.  As we have frequently stated, however, the credibility determinations of an administrative judge are "virtually unreviewable on appeal."  Bieber v. Dep't of the Army, 287 F.3d 1358, 1364 (Fed. Cir. 2002).  With respect to the unacceptable conduct charge, the administrative judge specifically noted that he had observed Ms. Ilmberger's demeanor at the hearing and found her testimony to be more convincing than that of Mr. Cabrera.  As to the charge that Mr. Cabrera deviated from his postal route, the administrative judge similarly explained that he found Ms. Christensen's testimony that Mr. Cabrera made several U-turns in front of Ms. Ilmberger's home to be more credible than Mr. Cabrera's conflicting testimony.  We have no reason to second-guess the administrative judge's decision to credit the testimony of other witnesses over that of Mr. Cabrera.

Mr. Cabrera's contention that the administrative judge "ignored the fact that the other party was also inconsistent in their separate statements to the police and the

postal service" is without merit.   In support of that assertion, Mr. Cabrera points to a single alleged inconsistency:   Mr. Cabrera alleges that Ms. Ilmberger "told the Ms. Sheriff and the USPS that she was going to the dentist," but that according to Ms. Christensen, Ms. Ilmberger had told Mr. Cabrera that she was going swimming.  It is not clear from the record that the two alleged statements are inconsistent, but in any event any possible inconsistency in the statements is not remotely sufficient to undermine the administrative judge's credibility judgment regarding the witnesses' version of the events of June 13.

Mr. Cabrera further argues that the administrative judge refused to consider testimony that other carriers often deviate from their routes without authorization.  But it was undisputed that other carriers sometimes deliver mail out of sequence.  In fact, the administrative judge acknowledged that practice "may indeed be common" and characterized Mr. Cabrera's argument that out-of-sequence deliveries often result in better customer service as "plausib[le]."   Nonetheless, the administrative judge noted that agency regulations specify that carriers may not deviate from their route for any purpose absent prior managerial authorization.   The agency, moreover, introduced evidence that such deviations "result in a measurable increase in work hours at the management level."   The administrative judge therefore found that the agency showed that Mr. Cabrera improperly deviated from his postal route, and we discern no error in that conclusion.

In a pre-hearing order, the administrative judge denied the agency's request to call several witnesses because other percipient witnesses more directly involved in the events at issue were already approved to testify.  The administrative judge also rejected

Mr. Cabrera's request to call several witnesses based on Mr. Cabrera's failure to show how their testimony would be relevant. Mr. Cabrera contends that the administrative judge erred in refusing to allow him to call those witnesses. However, a "determination to allow or exclude witness testimony is within the sound discretion of the administrative judge." Guise v. Dep't of Justice, 330 F.3d 1376, 1379 (Fed. Cir. 2003). After denying the witness requests, the administrative judge granted Mr. Cabrera and the agency leave to resubmit their requests along with a detailed proffer that described the relevance of each witness requested. Mr. Cabrera did not resubmit any of the witness requests. He has not shown that the administrative judge abused his discretion in requiring that the parties explain the relevance of requested witnesses, and he has failed to demonstrate that the administrative judge's ruling, even if erroneous, could have affected the outcome of the case. See Curtin v. Office of Pers. Mgmt., 846 F.2d 1373, 1378-79 (Fed. Cir. 1988).

Mr. Cabrera's other allegations of procedural error are also unpersuasive. He argues that the Board failed to consider his "bid award of Route # 4527." Mr. Cabrera did not raise that issue in the administrative proceedings and thus waived it, but in any event he has failed to show how the "bid award" evidence is relevant to the charges against him. Mr. Cabrera also asserts that he received inadequate assistance from his union representative during his "just cause" interview, but he presents no evidence suggesting that that the union representative failed to ensure that his rights were not violated during that interview.

Finally, Mr. Cabrera argues that the penalty of removal was excessive in light of the charges that were sustained against him. According to Mr. Cabrera, other agency

employees received lesser penalties for similar violations, and the agency should have considered re-training as an alternative to removal. We will not disturb an agency's choice of penalty so long as the agency considered the relevant factors and exercised discretion within tolerable limits of reasonableness. Douglas, 5 M.S.P.R. at 306; see O'Neill v. Dep't of Hous. & Urban Dev., 220 F.3d 1354, 1365 (Fed. Cir. 2000) (court will defer to agency's judgment unless the penalty is "so harsh and unconscionably disproportionate to the offense that it amounts to an abuse of discretion"). As the administrative judge explained, the deciding official in this case considered the relevant Douglas factors, including the nature and seriousness of the offenses, Mr. Cabrera's lengthy service with the agency, the notoriety of the offenses, the fact that Mr. Cabrera was on notice of the agency's standards of conduct, and the consistency of the penalty with those imposed on similarly situated employees.

As for the consistency of the penalty, Mr. Cabrera's assertion that he was "held to a higher standard" than other agency employees is without merit because the cases on which Mr. Cabrera relies are distinguishable. For example, in one case cited by Mr. Cabrera, Tryon v. United States Postal Service, 108 M.S.P.R. 148, 151 (2008), the full Board mitigated the penalty given to a mail carrier from removal to suspension because the administrative judge had rejected the most serious allegations of misconduct (kissing and making sexually inappropriate comments toward a postal customer) and because the agency had enhanced the penalty based on misconduct that was not cited in the notice of proposed removal. Those circumstances are not present in Mr. Cabrera's case. We therefore see no error in the administrative judge's determination upholding the agency's decision to remove Mr. Cabrera.