NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**CARA JENKINS,**
*Petitioner*

**v.**

**DEPARTMENT OF TRANSPORTATION,**
*Respondent*

---

2019-2075

---

Petition for review of the Merit Systems Protection Board in No. DC-0752-18-0428-I-1.

---

Decided: August 6, 2020

---

GEORGE CHUZI, Kalijarvi, Chuzi, Newman & Fitch, PC, Washington, DC, for petitioner. Also represented by WILLIAM COFFIELD, Berliner, Corcoran & Rowe, LLP, Washington, DC.

SEAN LYNDEN KING, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for respondent. Also represented by ETHAN P. DAVIS, TARA K. HOGAN, ROBERT EDWARD KIRSCHMAN, JR.

---

Before LOURIE, MOORE, and O'MALLEY, *Circuit Judges*.

LOURIE, *Circuit Judge*.

Cara Jenkins appeals from the decision of the Merit Systems Protection Board ("the Board") affirming the U.S. Department of Transportation's ("the Agency") action removing her from her position as Chief of Staff with the Federal Aviation Administration's ("FAA") Office of Human Resources Management ("AHR") in Washington, D.C.. *Jenkins v. Dep't of Transp.*, No. DC-0752-18-0428-I-1, 2019 WL 1516844 (Apr. 3, 2019) ("*Initial Decision*"). For the following reasons, we *affirm*.

## BACKGROUND

Jenkins was employed by the Agency for nearly 30 years until her removal in March 2018. During her final year of employment, she served as the Chief of Staff to the FAA's Associate Administrator for Human Resources.

In 2017, one of Jenkins's subordinates, Sharon Bartley, complained to the FAA Accountability Board that Jenkins had created a hostile work environment. In support of her complaint, Bartley provided the Accountability Board with a number of personal cell phone text message exchanges that she had with Jenkins. Many of the text messages were disparaging toward Jenkins's colleagues, including senior officials at the FAA. Moreover, many of the messages contained derogatory comments about the race and gender of Jenkins's colleagues.

The Agency requested an investigation into Bartley's allegations from the Office of Security and Hazardous Materials Safety ("ASH"). During that investigation, ASH Agent Richard Busser interviewed Jenkins and asked her about text messages she had sent to Bartley, and Jenkins subsequently provided a signed statement about the interview. J.A. 183–91. The Agency also forensically searched Bartley's phone and exported text messages sent by Jenkins into a hard drive. Additionally, during the

investigation, another FAA employee, Lavada Strickland, came forward with copies of text messages from Jenkins that were similar in nature to the messages obtained from Bartley's phone.

Upon concluding its investigation, the Agency prepared a Report of Investigation, which included a compilation of disparaging text messages sent by Jenkins. *See* J.A. 90–156.  On December 6, 2017, the Agency proposed to remove Jenkins from her position as Chief of Staff.  The Notice of Proposed Removal provided three reasons: (1) inappropriate conduct; (2) making disparaging remarks racial in nature; and (3) lack of candor.  J.A. 65–80.  In support of the charge for inappropriate conduct, the Agency provided 18 specifications, each one citing a separate text message that negatively referenced one or more of Jenkins's colleagues at the FAA.  J.A. 67–69.  In support of the charge for making disparaging remarks racial in nature, the Agency provided 22 specifications, each one citing a separate text message in which Jenkins made a racial comment about a colleague.  In support of the charge for lack of candor, the Agency provided four specifications, three citing Jenkins's statement that it was "a lie" that she constantly told Bartley that there are a lot of dumb people working in HR, and the fourth citing Jenkins's statement: "I do not admit to the validity of these messages. . . . They are allegedly from [a] phone identified as 'Cara' with no phone number. . . . I am not saying I did not send them but that I simply do not remember sending some of them."  J.A. 70–74.

After Jenkins provided an oral and written response to the Notice of Proposed Removal, the deciding official for the Agency issued a Decision on Proposed Removal.  J.A. 48–56.  The deciding official found a nexus between Jenkins's misconduct and the Agency's ability to perform its functions because, among other things, Jenkins's misconduct undermined the credibility and managerial authority of senior officials at the FAA.  *See, e.g.*, J.A. 49.  The deciding

official thus determined that "the information contained in the Notice of Proposed Removal is fully supported by the evidence." J.A. 52. Moreover, as aggravating factors, the deciding official highlighted the seriousness of Jenkins's conduct, the loss of confidence in her reliability, judgment, and trustworthiness, questions about her integrity, and the fact that she was a manager held to a higher standard. J.A. 52–54. Ultimately, the deciding official determined that removal was the "lowest level of discipline necessary to address [Jenkins's] behavior." J.A. 54.

Jenkins appealed to the Board. For the first two charges—inappropriate conduct and making disparaging remarks racial in nature—the Board's Administrative Judge ("AJ") sustained the Agency's charges based on Jenkins's "numerous inappropriate, derogatory, and racially disparaging text messages" exchanged with a subordinate employee and contract employee talking about FAA leadership. *See, e.g.*, *Initial Decision*, 2019 WL 1516844, at *10. In finding a nexus between Jenkins's misconduct and the efficiency of the Agency's service, the AJ rejected Jenkins's argument that her misconduct was insulated by the fact that the messages were sent using a personal phone rather than government property. *Id.* at *11. The AJ also sustained the Agency's lack of candor charge because Jenkins was untruthful and not fully forthcoming with respect to the substance of the text messages. *Id.* at *11–13. Additionally, the AJ upheld the Agency's decision that removal was the appropriate penalty for Jenkins's misconduct and rejected Jenkins's argument that the deciding official failed to consider the relevant factors. *Id.* at *16–19.

The AJ's decision became the final decision of the Board on May 8, 2019. Jenkins appealed directly to this court. We have jurisdiction under 28 U.S.C. § 1295(a)(9).

## DISCUSSION

Our review of a decision by the Board is limited. Pursuant to 5 U.S.C. § 7703(c), a Board decision must be

affirmed unless it is found to be: (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence. *Hayes v. Dep't of the Navy*, 727 F.2d 1535, 1537 (Fed. Cir. 1984). The Board's decision must be sustained when a rational basis exists for its conclusions. *Carroll v. Dep't of Health & Human Servs.*, 703 F.2d 1388, 1390 (Fed. Cir. 1983) (citing *United States v. Shimer*, 367 U.S. 374 (1961); *Mississippi Valley Barge Line Co. v. United States*, 292 U.S. 282, 286–87 (1934)).

Jenkins raises three challenges on appeal. First, Jenkins challenges the Board's finding of a nexus between her private text messages and the FAA's ability to function. Second, Jenkins challenges the Board's finding of a lack of candor. And third, Jenkins challenges the Board's decision to uphold the penalty of removal. We address each challenge in turn.

I

To sustain the charge of misconduct, the agency must have established by preponderant evidence the existence of a nexus between the employee's misconduct and the work of the agency, *i.e.*, the agency's performance of its functions. *See Doe v. Dep't of Justice*, 565 F.3d 1375, 1379 (Fed. Cir. 2009) (citing *Brown v. Dep't of the Navy*, 229 F.3d 1356, 1358 (Fed. Cir. 2000)). "As long as the agency can prove that the removal of [the employee] promoted the efficiency of the service, however, nothing prevents the agency from relying upon off-duty behavior." *Weekes v. Dep't of Homeland Sec.*, 351 F. App'x 442, 445 (Fed. Cir. 2009) (citing *Brown*, 229 F.3d at 1361; *Allred v. Dep't of Health & Human Servs.*, 786 F.2d 1128, 1130 (Fed. Cir. 1986)). Here, the misconduct at issue consists of Jenkins' prolonged history of repeatedly making disparaging and racial comments about FAA leadership to other FAA employees, including one of her subordinates. Substantial evidence

supports the Board's finding that such misconduct was related to Jenkins's job responsibilities and was detrimental to the Agency's performance.

First, Jenkins's misconduct negatively affected the job performances and work environments of Bartley and Strickland, who were the recipients of the offending messages. For example, in a statement provided to Agent Busser, Bartley described the toxic environment and the effects of Jenkins's behavior on Bartley's health and job performance:

> I have put up with [Jenkins's] abusive behavior for many months now and the only reason I filed a complaint with the Accountability Board on July 24, 2017, was because [Jenkins] has created such a hostile work environment it has greatly affected my health. AHR has now become like a gossip show instead of a workplace of professionals.

J.A. 270; *see also* J.A. 275 ("[Jenkins] is the main pivot point for the toxic environment I, and others, are subjected to."); J.A. 277(" [Jenkins] also created the hostile work environment that has now affected my health so much I am faced with quitting the FAA if I cannot transfer to another position in the agency."); J.A. 278 ("Working in that environment has changed me [sic] my health, I can't sleep . . . my health has been so affected by what I've endure[d] these past few months."). Additionally, according to Agent Busser's Record of Interview with Strickland, she "felt like quitting her AHR detail because of all the stress. . . . It was the stress of all the drama and negativity caused by, and perpetuated by, [Jenkins]." J.A. 266. Strickland also noted that "[Jenkins's] behavior created so much tension and mistrust in AHR that many employees want to transfer out of AHR." *Id.*

In addition to directly affecting Bartley and Strickland, substantial evidence supports the Board's finding that Jenkins's messages undermined the authority and credibility

of senior officials at the FAA, a point that was emphasized in both the Notice of Proposed Removal and the Decision on Proposed Removal. J.A. 75, J.A. 49. This court has cited with approval the "principle of Board law holding that insolent disrespect toward supervisors seriously interferes with an agency's fulfillment of its mission." *O'Neill v. Dep't of Hous. & Urban Dev.*, 220 F.3d 1354, 1364 (Fed. Cir. 2000). Here, the evidence, including statements from Bartley and Strickland, confirms that Jenkins's misconduct had the effect of undermining senior officials in a way that interfered with the Agency's ability to function. *See, e.g.*, J.A. 274 (Bartley stating that Jenkins "really had me believing a lot of things about people in HR/Leadership"); J.A. 266 (Strickland's Record of Interview noting that Jenkins "many times disparaged AHR employees by calling them backstabbers, dumb and that they did not know how to do their jobs, including AHR-1 and AHR-2").

Moreover, substantial evidence supports the Board's finding that Jenkins's pattern of misconduct created serious questions about the quality of her judgment. *Id.* at \*11. Once the messages were revealed, the Agency lost confidence and trust in Jenkins and her ability to perform her job in a senior leadership role. *See* J.A. 54, 78. This court has recognized that loss of trust in an employee's judgment can be a sufficient nexus to support disciplinary action for misconduct. *See Brook v. Corrado*, 999 F.2d 523, 527 (Fed. Cir. 1993) (citing *Sanders v. United States Postal Serv.*, 801 F.2d 1328, 1332 (Fed. Cir. 1986)).

These connections to Jenkins's job individually and collectively demonstrate that Jenkins's comments directly impacted the work environment at the FAA's Office of Human Resources Management. Thus, substantial evidence supports the Board's finding that the misconduct had a nexus to the Agency's ability to perform its functions.

In challenging the Board's findings, Jenkins argues that her text messages did not affect the Agency's functions

because they have nothing to do with safe air travel. But such an argument, if extended to its logical conclusion, would likely insulate most government employee misconduct from penalty. The law requiring a nexus to the Agency's "ability to perform its functions" should not be read so narrowly. Jenkins's misconduct directly affected the environment in which she worked—namely, the FAA's Office of Human Resources Management—and thus adversely affected the Agency's ability to function.

Jenkins also argues that there is no nexus because her comments "were intended to be and were private using personal cell phones and no government resources." Appellant Br. 29. Jenkins contends that "private off-duty speech is not intended to be the government's business" and "searching private speech for statements potentially subject to discipline is beyond the government's reach." Appellant Br. 38. But this is not a case in which the Agency violated Jenkins's right to privacy or free speech by illegally searching Jenkins's private communications for disciplinable conduct.[1] The offending text messages were provided to the Agency by its employees, Bartley and Strickland, in connection with the Agency's investigation into a complaint about a hostile work environment. Once Jenkins's misconduct and its effect on the work environment became known to the Agency, there was no law, rule, or regulation that prevented the Agency from addressing the misconduct merely because Jenkins used a personal phone to send messages that she "intended" to be private.

Additionally, Jenkins argues that a government employee can only be disciplined for speech if it is speech in public, in the workplace, or on social media. Appellant Br. 35. Jenkins attempts to support that argument by

---

[1]    Though Jenkins raised an argument based on freedom of speech before the Board, she has not raised any Constitutional arguments in this appeal.

contrasting her allegedly "private" speech with instances in which federal employees have been disciplined for what she argues was non-private speech. *Id.* at 35–37. But the comparison is inapposite. The fact that other federal employees have been disciplined for other misconduct does not immunize Jenkins's behavior from punishment in this case.

Overall, Jenkins's arguments focus entirely on the "where," "when," and "how" of her misconduct—*i.e.,* that it was done outside the workplace, while she was off-duty, using her personal phone—while ignoring the substance of what she actually did. The Board, by contrast, properly considered those circumstantial facts in the context of the actual misconduct, namely, that Jenkins repeatedly sent disparaging and racial comments to a subordinate and other employee about senior officials at the FAA. Substantial evidence supports the Board's finding that such prolonged and persistent misconduct—whether achieved through text messages, in person, or by carrier pigeon—has a nexus to the work of the Agency.

II

We next turn to Jenkins's challenge regarding the lack of candor charge. Jenkins makes two arguments. First, Jenkins argues that she did not lack candor when she said it was "a lie" that she constantly told Bartley that there are a lot of dumb people working in HR. And second, Jenkins argues that her denial of the validity of the text messages was truthful. We find both arguments unpersuasive.

For her first argument, Jenkins contends that she "reasonably concluded" that Agent Busser was asking whether she "constantly" made the exact statement: "[T]here are a lot of dumb people working in HR." Appellant Br. 41. We do not find such a strawman interpretation to be reasonable. One need only contrast the three text messages in which Jenkins's explicitly referred to a colleague as "dumb" or "dummy" with Jenkins's unequivocal denial to conclude

that the Board had substantial evidence to affirm the lack of candor charge. That conclusion is bolstered even further by contrasting Jenkins's prolonged and persistent history of disrespectful and disparaging text messages with her disingenuous statements immediately following that unequivocal denial: "I do not think like that nor do I speak like that about people. I have the utmost respect for my colleagues and have never been disrespectful." *See* J.A. 186. In view of the record, it is impossible to conclude that the Agency lacked substantial evidence to find that Jenkins was less than truthful regarding the subject matter of the text messages.

Jenkins next argues that the Agency failed to meet its burden of showing that she "knowingly" gave incorrect or incomplete information about the validity of the text messages. Appellant Br. 46 (citing *Fargnoli v. Dep't of Commerce*, 123 M.S.P.R. 330, 338 ¶ 17 (2016)). Jenkins contends that she had a right to resist confirming from memory the validity of quotes from messages that she had allegedly sent long before the interview, that she never denied that she sent the messages, and that her statement that she does not remember sending some of the messages remains true. Appellant Br. 45–46. We reject Jenkins's arguments because the record tells a different story. Substantial evidence demonstrates that Jenkins recalled the messages and spoke substantively about them during her interview with Agent Busser but then attempted to walk back large portions of her interview with a generic statement about her lack of memory. *See* J.A. 189–91. The fact that Jenkins did not tell an overt lie by outright claiming that she did not send the messages does not negate her lack of candor with regard to her memory of the text messages. Thus, substantial evidence supports the Board's affirmance of the Agency's lack of candor charge.

## III

Finally, we address Jenkins's challenge that the Board erred in affirming the penalty of removal. Jenkins contends that the AJ made two errors in applying the relevant factors set forth in *Douglas v. Veterans Admin.*, 5 M.S.P.R. 280, 305 (1981). First, Jenkins argues that the penalty of removal is improper because it lacks "consistency . . . with those imposed upon other employees for the same or similar offences." Appellant Br. 48 (quoting *Williams v. Social Sec. Admin.*, 586 F.3d 1365, 1368 (Fed. Cir. 2009)). And second, Jenkins argues that the Board failed to consider whether she could be rehabilitated. We are unpersuaded by either argument.

In support of her argument that the penalty of removal is not consistent with others who have committed the same offenses, Jenkins points to the FAA Table of Disciplinary Offenses and Penalties, J.A. 214–25, and to lists complied by Jenkins and by the Agency of allegedly comparable employees disciplined for making disparaging statements. Jenkins argues that the table only recommends reprimands or suspensions for a first offense of the misconduct with which she has been charged. Appellant Br. 49. And Jenkins contends that the Agency cannot point to any other employee who was removed for making offensive comments. *Id.* at 50.

Jenkins's argument is unavailing because the choice of penalty for an employee's misconduct is a matter largely committed to the discretion of the agency. *See Quinton v. Dep't of Transp.*, 808 F.2d 826, 829 (Fed. Cir. 1986) (citing *Miguel v. Dep't of the Army*, 727 F.2d 1081, 1083 (Fed. Cir. 1984)). The FAA Table of Disciplinary Offenses and Penalties is provided as guidance rather than a mandate, *see* J.A. 284–85, and, in any event, the table explicitly contemplates removal for a first offense of lack of candor. *See* J.A. 215 (recommending that the penalty for a first offense of lack of candor be a 14-day suspension or removal).

Additionally, as the Agency points out, Jenkins's arguments are predicated on separating her three offenses, which would effectively remove the Agency's discretion to impose a realistic penalty that accounts for her total misconduct. And, regarding Jenkins's arguments about comparable offenders, we are not able to second-guess the evidentiary and factual findings that led to the Board's determination that there were no comparable cases involving this type of prolonged and persistent egregious misconduct directed at the highest level of agency leadership by a person with such a high-level position as Jenkins.

Turning to Jenkins's argument about her potential rehabilitation, Jenkins contends that the Board ignored crucial evidence of her remorse and her clean record. Appellant Br. 53 (citing *Portner v. Dep't of Justice*, 119 M.S.P.R. 365, ¶ 11 (2013)). But the record demonstrates that the deciding official seriously considered those mitigating factors and found that they were outweighed by the gravity of her offense, the Agency's loss of confidence in her reliability, judgment and trustworthiness, questions about her integrity, and her high-level position as a manager. *See* J.A. 52–54. The Board concluded, under the relevant standard of review, that the deciding official had not failed to consider the relevant *Douglas* factors, including potential for rehabilitation. *Initial Decision*, 2019 WL 1516844, at \*17–19. We have no basis to reconsider that reasonable conclusion.

## CONCLUSION

We have considered Jenkins's remaining arguments, but we find them unpersuasive. Accordingly, the decision of the Board is affirmed.

## AFFIRMED